**F I L E D**
**Tenth Circuit**

**PUBLISH**

**July 20, 2007**

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

FOREST GUARDIANS; COLORADO
WILD; CENTER FOR NATIVE
ECOSYSTEMS; CARSON FOREST
WATCH; K. RANDALL McKOWN;
GILBERT DURAN; and ALICE DURAN,

     Plaintiffs – Appellants,

v.

UNITED STATES FOREST SERVICE,

     Defendant – Appellee.

- - - - - - - - - - - - - - -

INTERMOUNTAIN FOREST
ASSOCIATION; INTERMOUNTAIN
RESOURCES, LLC; and MOUNTAIN
VALLEY LUMBER CO., INC.,

     Defendants – Intervenors –
Appellees.

No. 07-1020

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 06-CV-01231)**

---

Nicolas F. Persampieri (Andrea Zaccardi with him on the briefs), Earthjustice,
Denver, Colorado for the Plaintiffs – Appellants.

Scott W. Horngren, Haglund, Kelley, Horngren, Jones, & Wilder, LLP, Portland,
Oregon and John L. Smeltzer (Kenneth Capps, Office of the General Counsel,

U.S. Department of Agriculture; Matthew J. McKeown, and Mark R. Haag with them on the briefs), U.S. Department of Justice, Washington, D.C. for the Defendants – Appellees.

---

Before **LUCERO**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Forest Guardians[1] appeal a district court decision finding that the United States Forest Service ("USFS") complied with the relevant laws in approving the County Line Vegetation Management Project. They argue that USFS: (1) violated the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604(b), by failing to collect actual population data for management indicator species ("MIS"); (2) failed to provide substantial evidence for its conclusion that the relevant soil standard would be met; and (3) violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., by failing to consider the impacts of logging trucks on neighboring landowners. We take the district court's view of the matter and reject Forest Guardians' first and third claims on the merits. We further conclude that Forest Guardians did not present their

---

[1] Plaintiffs in this case include Forest Guardians, Colorado Wild, The Center for Native Ecosystems, Carson Forest Watch, K. Randal McKown, Gilbert Duran, and Alice Duran. We hereinafter use "Forest Guardians" to refer to plaintiffs.

second claim in their administrative appeal and have thus forfeited it. Accordingly, we **AFFIRM**.

## I

The Rio Grande National Forest covers nearly two million acres in southern Colorado, including the headwaters of the historic Rio Grande. Spanning both sides of the Continental Divide, it encompasses a wide variety of breathtaking landscapes, from alpine desert to the organ pipes of the Wheeler Geologic Area, long silenced after their deafening creation from the volcanic froth of the Creede Caldera. Pursuant to the NFMA, USFS management of the forest is guided by the Rio Grande National Forest Land and Resource Management Plan (the "Forest Plan"), which was comprehensively amended in 1996 to comply with the USFS regulations that were then in effect. See Nat'l Forest Sys. Land and Res. Mgmt. Planning, 47 Fed. Reg. 43,026 (Sept. 30, 1982) (formerly codified at 36 C.F.R. § 219) (the "1982 Regulations").

Following an administrative appeal brought by several environmental groups, USFS determined that additional amendments to the Forest Plan were necessary. Under the 1996 plan, USFS failed to designate MIS as was then required by 36 C.F.R. § 219.19(a)(6). MIS, like canaries in coal mines, are used as proxies for environmental health; problems in MIS populations indicate larger ecosystem trouble. In 2003, USFS again amended the Forest Plan to remedy its MIS shortcoming. In the Environmental Assessment accompanying that

amendment, USFS stated, "The primary purpose of the MIS amendment is to assure that species viability is measured and monitored as directed in 36 C.F.R. 219.19." Similarly, in its Decision Notice/Finding of No Significant Impact for the amendment, USFS concluded "MIS selection, monitoring, and assessment need to meet the intent of monitoring and evaluating MIS as described in the 1982 planning regulations (36 C.F.R. 219.19)."

Towards that end, USFS selected nine MIS for the Rio Grande National Forest: the brown creeper, the hermit thrush, the pygmy nuthatch, Lincoln's sparrow, Wilson's warbler, the vesper sparrow, the mule deer, the Rocky Mountain elk, and the Rio Grande cutthroat trout. Where Rio Grande cutthroat trout are not present, USFS designated several other trout species to be monitored in their stead. The amendment also included a chart establishing monitoring schedules and methods for MIS.[2] Rio Grande cutthroat trout are to be evaluated every five years, using "Stream surveys/DOW surveys."[3] MIS birds are subject to "[p]oint counts, nest search, presence surveys, [and/or] MCB surveys,"[4] to be conducted "[a]nnually at the state and national forest level." A footnote to the MIS birds discussion indicates that "[p]roject-specific monitoring will be

_____

[2] The full text of the amending chart is appended to this opinion.

[3] "DOW" refers to the Colorado Division of Wildlife.

[4] "MCB" refers to the Monitoring Colorado's Birds project, administered by the Rocky Mountain Bird Observatory.

- 4 -

incorporated into Forest Plan monitoring as applicable." Finally, mule deer and Rocky Mountain elk are to be evaluated annually using DOW surveys. The Forest Plan itself does not explicitly incorporate 36 C.F.R. § 219.19.

Following adoption of the 2003 amendment, and the discovery of a significant spruce beetle infestation, USFS developed a logging project referred to as the "County Line Vegetation Management Project." Under that project, USFS authorized the harvest of 24 to 29 million board feet of timber from a 2282 acre area. In the southern section of that area, infested trees will be removed from 841 acres. In the northern section, where infestation is minimal, 715 acres will be thinned. Approximately eighteen miles of roads will be constructed or reconstructed. Two sections of the project area are considered landslide risks and will not be logged. In addition, USFS instituted a 100 foot buffer zone on both sides of any creek. Two waterways fall within the project area – the Rio de los Pinos and Wolf Creek.

To assist it in developing an Environmental Impact Statement ("EIS") for the project, USFS prepared a "Specialist Report for MIS," which details the agency's MIS monitoring activities. Two MIS, the pygmy nuthatch and the vesper sparrow, were not analyzed because no suitable habitat for those species exists in the project area. Two others, Wilson's warbler and Lincoln's sparrow, were also excluded because the project area included only a very limited amount of habitat for those species. For the final two avian MIS, the brown creeper and

the hermit thrush, USFS estimated project-level populations using potential population densities. Project-level point counts confirmed the presence of both species. Because MIS monitoring did not begin until 2004, USFS did not yet have forest-wide trend data. Instead, it utilized trend data from the MCB program, the Colorado Land Bird Conservation Plan, and the Colorado Breeding Bird Atlas project. The specialist report noted that the project could displace up to 311 pairs of brown creeper and 155 pairs of hermit thrush, but that such numbers represented a negligible portion of the forest-level populations of these species.

Rocky Mountain elk and mule deer population data were based on Colorado DOW surveys. However, given the range of these animals, it was not feasible to estimate populations for a relatively small 2282 acre site. The report predicted that the project would not significantly impact either species. Rio Grande cutthroat trout forest-level population trend data were based on Colorado DOW surveys. USFS also reported that core trout populations were found in Rio de los Pinos about one half mile upstream from the project, and in Wolf Creek one mile downstream from the project. Both populations are cut off from the project area by the presence of large waterfalls. Population data for these groups were based on 2001 and 2003 survey data. Although it acknowledged the project could adversely impact the downstream population in the short term, USFS concluded

that, with mitigation measures, the project would not seriously impact species density.

In response to a Forest Plan requirement that USFS "[m]anage land treatments to limit the sum of severely burned and detrimentally compacted, eroded, and displaced land to no more than 15% of any land unit," USFS reported the following: (1) Existing soil impacts were estimated at less than 5% of the project area, consisting of past logging roads and skid trails; (2) No recent logging projects were conducted in the southern section of the project area; (3) A number of mitigation techniques, including use of existing skid trails and the potential use of a winged subsoiler to till compacted lands, would keep the project within the 15% limit; (4) Based on the Water Erosion Prediction Program ("WEPP") model, the project would increase erosion rates, but would have little impact on overall erosion; and (5) Continuous inspection by USFS soil experts would ensure project compliance.

These statements are supported by five documents in the administrative record. John Rawinski, a forest soil scientist, provided reports for two on-site investigations he conducted. The first discusses soil conditions on and around an existing road that could be used for the project. The second details his inspection of an area excluded from the project due to its landslide potential. The third document is a collection of notes and reports from prior projects discussing soil conditions in the project area. Fourth, a report from geotechnical engineer

Michael Burke discusses landslide potential in two areas that were subsequently excluded from the project. Finally, a report also authored by Rawinski provides erosion rate estimates using the WEPP model.

Many individuals and groups, including Forest Guardians, submitted comments to USFS with respect to the project. Private abutting landowners K. Randal McKown, and Alice and Gilbert Duran submitted comments about "noise, traffic, and dust" that would be generated by logging trucks. Responding to the private landowners in the final EIS, USFS noted that the project "would have temporary effects to recreation users and private land owners adjacent to the proposed treatment areas, especially during the active timber sales with heavy truck traffic on the roads leading into the sale areas."

On the same day it issued the final EIS, USFS filed its Record of Decision. Several environmental groups,[5] along with a number of private landowners, challenged the project in an administrative appeal. After USFS denied that appeal, Forest Guardians filed a suit in federal district court alleging: (1) USFS violated the NFMA by failing to collect project-level MIS population data; (2) USFS violated the NFMA by failing to meaningfully analyze whether the project meets the 15% soil productivity standard; (3) USFS violated the NFMA by

---

[5] Those groups were: Forest Guardians, Colorado Wild, The Center for Native Ecosystems, The Rocky Mountain Chapter of the Sierra Club, The San Luis Valley Ecosystems Council, The San Juan Citizens Alliance, Carson Forest Watch, and the Wolf Creek Wheel Club.

deficiently analyzing the project's impact on stream health; and (4) USFS violated NEPA by failing to adequately analyze certain indirect and cumulative effects of the project. Intermountain Forest Association, Intermountain Resources, LLC, and Mountain Valley Lumber Co., Inc. intervened on behalf of USFS. On December 6, 2006, the district court issued an order and judgment rejecting Forest Guardians' claims and denying them relief. Forest Guardians now appeal the district court's denial of relief on their first, second, and fourth claims.

**II**

When, as here, a district court's decision is based on its review of the administrative record, we conduct our review de novo. Utah Envtl. Cong. v. Bosworth, 443 F.3d 732, 739 (10th Cir. 2006) ("UEC III"). Forest Guardians challenge USFS's approval of the project under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 500 et seq. The APA mandates that agency action be set aside when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We must determine whether the challenged action "was based on consideration of the relevant factors and whether there has been a clear error of judgment." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (quotation omitted). In doing so, we afford "substantial deference" to agencies' interpretations of their own regulations. UEC III, 443 F.3d at 739.

Forest Guardians' initial claim is that USFS violated the NFMA's consistency provision by failing to collect actual MIS population data before approving the County Line project. NFMA requires that all "contracts . . . for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). In this case, the relevant land management plan is the Rio Grande National Forest Land and Resource Management Plan, including the 2003 amendment.

Forest Guardians advance a multi-step argument. First, they contend, the 2003 Forest Plan amendment incorporated the 1982 Regulations, specifically the 1982 version of 36 C.F.R. § 219.19. Second, they cite Utah Envtl. Cong. v. Bosworth, 372 F.3d 1219 (10th Cir. 2004), ("UEC I") for the proposition that the 1982 version of 36 C.F.R. § 219.19[6] requires USFS to collect actual MIS population data for project-level activities, rather than relying on estimates. See id. at 1227. Thus, they claim that the Forest Plan requires the collection of actual population data prior to a project's approval.

"Forest plans may require particular standards to be followed regardless of later changes in the regulations." Ecology Ctr., Inc. v. U.S. Forest Serv., 451

---

[6] USFS implementing regulations were replaced first by a transitional rule in 2000, see Nat'l Forest Sys. Land and Res. Mgmt. Planning, 65 Fed. Reg. 67,514 (Nov. 9, 2000), and then by a final rule in 2005, see Nat'l Forest Sys. Land Mgmt. Planning, 70 Fed. Reg. 1,023 (Jan. 5, 2005). See also UEC III, 443 F.3d at 737 (discussing the history of the regulations). Forest Guardians do not allege that USFS violated the subsequent versions of the rules.

F.3d 1183, 1190 (10th Cir. 2006). If a forest plan adopts the language of a generally applicable regulation, that language remains binding on USFS regardless of subsequent regulatory amendments, until the forest plan itself is altered. Plaintiffs in both Ecology Ctr. and UEC III advanced claims similar to Forest Guardians' argument here; however, in both prior cases we determined that the forest plans at issue did not adopt the 1982 Regulations. Id.; UEC III, 443 F.3d at 748. The same is true in this case.

Forest Guardians cite several documents that reference the 1982 Regulations: the Environmental Assessment for the 2003 Amendment, the Decision Notice/Finding of No Significant Impact for that amendment, and the Specialist Report for MIS compiled for the County Line project. But the Forest Plan itself does not explicitly incorporate the 1982 Regulations. Nor do the Forest Plan's MIS-monitoring requirements track the language of the 1982 Regulations. Rather, the Forest Plan mandates forest-wide, periodic monitoring of MIS. Such monitoring may include direct observation, but reliance on DOW or MCB surveys is also permitted.

The disconnect between the USFS planning documents, which specifically note that the purpose of the 2003 Amendment was to adopt the 1982 version of 36 C.F.R. § 219.19, and the Forest Plan itself, which does not require actual population data at the project level, is easily explained. In 2003, before we determined that USFS was required to collect actual population data at the

project-level, see UEC I, 372 F.3d at 1227, USFS took the position that the 1982 Regulations did not require actual counting. See Utah Envtl. Cong. v. Bosworth, 439 F.3d 1184, 1191 (10th Cir. 2006) ("UEC II") ("Prior to UEC I, the Forest Service contended that it need not conduct 'head-counts' of MIS in a planning area because it had discretion to assess a project's effects on MIS using habitat data, population data, or both."). At the time it drafted the 2003 Amendment planning documents, USFS believed the MIS monitoring requirements included in the Forest Plan, which do not mandate project-level head counts, complied with the 1982 Regulations. Although we later held that USFS's position on the 1982 Regulations was incorrect in UEC I, our holding in that case does not control our interpretation of the Forest Plan.

Because the Forest Plan does not incorporate the 1982 Regulations, we must look to the plan itself, not the Code of Federal Regulations or our case law, to determine whether USFS complied with its MIS-monitoring duties. Comparing the text of the Forest Plan with USFS's actions, we conclude that it did. With respect to the Rio Grande cutthroat trout, USFS relied on Colorado DOW surveys for forest-wide trend data, precisely as directed by the Forest Plan. For the trout populations closest to the project area, USFS considered prior survey data from 2001 and 2003, both within the plan's five-year review cycle. Mule deer and Rocky Mountain elk population data were also based on Colorado DOW surveys, as directed by the Forest Plan. Finally, USFS relied on MCB surveys for forest-

level MIS bird data.  The Forest Plan includes such surveys in its list of acceptable bird monitoring techniques.  Although the plan includes a footnote indicating that project-specific monitoring of MIS birds will be conducted "as applicable," Forest Guardians do not argue that this notation required project-specific monitoring in this case.  Accordingly, USFS complied with the Forest Plan's MIS-monitoring directives.

**III**

Forest Guardians advances a second NFMA consistency claim.  They argue USFS failed to provide substantial evidence for its conclusion that the project would comply with the Forest Plan's soil requirements.  Agency decisions must be based on "substantial evidence," which is evidence sufficient to "justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact."  Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir. 1994) (quotation omitted).  Evidence is not substantial if it "constitutes mere conclusion."  Id. at 1581.

USFS argues that Forest Guardians have forfeited this claim by failing to adequately present their objection during administrative proceedings.  Plaintiffs must exhaust administrative procedures before filing suit against USFS.  See 7 U.S.C. § 6912(e).[7]  Parties generally must "'structure their participation so that it

_____

[7] The district court did not rule on the exhaustion issue, and it was apparently not raised below.  As a general matter, we do not consider issues that

(continued...)

- 13 -

alerts the agency to the parties' position and contentions,' in order to allow the agency to give the issue meaningful consideration." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004) (quoting Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 553 (1978)) (omission and alteration omitted). Claims not properly raised before an agency are waived, unless the problems underlying the claim are "obvious," id. at 764-65, or otherwise brought to the agency's attention, see Wyo. Lodging & Rest. Ass'n v.

---

[7](...continued)
were not raised below. See Walker v. Mather (In re Walker), 959 F.2d 894, 896 (10th Cir. 1992). That rule, however, "is not inflexible and the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Anixter v. Home-stake Prod. Co., 77 F.3d 1215, 1229 (10th Cir. 1996) (quotations and citations omitted).

The general waiver rule does not apply to jurisdictional issues, which may be raised at any time. See Huerta v. Gonzales, 443 F.3d 753, 755 (10th Cir. 2006). Thus USFS would be able to raise this claim if § 6912(e) is a jurisdictional statute. Circuits have split on that question. See Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp., 440 F.3d 992, 997-98 (8th Cir. 2006) (noting the split and collecting cases). Rather than decide that issue of first impression, we exercise our discretion to hear USFS's argument for the first time on appeal regardless. Such review may be appropriate when, as here, "the proceedings below resulted in a record of amply sufficient detail and depth from which the determination may be made." United states v. Mendez, 118 F.3d 1426, 1431 n.2 (10th cir. 1997) (quotation omitted). The fact that exhaustion is an issue of law, see Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134, 1138 (10th Cir. 2005), also counsels in favor of considering the defense, see Ross v. United States Marshal, 168 F.3d 1190, 1195 n.5 (10th Cir. 1999), as does the fact that the issue presents an alternative basis for affirmance. See Stahmann Farms, Inc. v. United States, 624 F.2d 958, 961 (10th Cir. 1980). Notably, although Forest Guardians mention that USFS raised the exhaustion issue for the first time on appeal, they do not argue that the issue has been waived; instead, they proceeded to fully brief it. For these reasons we deem it appropriate to consider administrative exhaustion.

U.S. Dep't of the Interior, 398 F. Supp. 2d 1197, 1211 (D. Wyo. 2005) (holding that the presence of third party comments addressing an issue put an agency on notice). In order to satisfy exhaustion requirements, a plaintiff must present its claim to USFS in sufficient detail to allow the agency to rectify the alleged violation. See Native Ecosystem Council v. Dombeck, 304 F.3d 886, 899-900 (9th Cir. 2002); Kleissler v. U.S. Forest Serv., 183 F.3d 196, 202 (3d Cir. 1999).

In response to the draft EIS for the County Line project, Forest Guardians submitted a comment listing a number of complaints. With respect to the soil standard, they stated:

> The [Water Conservation Practices Handbook] further requires that no more than 15% of the soils in any watershed be detrimentally compacted, eroded, or displaced. Yet the [draft EIS] discloses that 21.4% of the 7th level watershed of concern (Rio de los Pinos Tributary) will be affected under [the selected alternative]. Further, the [draft EIS] notes that more than 15% of the total watershed disturbance will occur, flatly violating the [Watershed Conservation Practices Handbook]. . . .
> The [draft EIS] notably calculates the total equivalent disturbance acreage as 15% of each harvest area. What data or research is this figure based on? It appears that the Forest Service chose to calculate it at 15%, not because there is any data or research that can justify this figure, but because it is the maximum permitted.

(citations omitted). USFS included much of this comment in the final EIS, responding that Forest Guardians improperly conflated the soil standard with watershed analysis. Under the soil standard, USFS must "[m]anage land treatments to limit the sum of severely burned and detrimentally compacted, eroded, and displaced land to no more than 15% of any land unit." In conducting

- 15 -

watershed analysis, USFS classifies a watershed as "of concern" if a certain percentage of its land is "disturbed." As USFS noted in its EIS response to Forest Guardians' comments, there are several differences between the two standards: (1) Watersheds are typically much larger than the activity areas considered in the soil standard; (2) "Disturbed," "detrimentally compacted," "detrimentally eroded," "detrimentally displaced" and "severely burned" are terms of art with specific definitions – they are not interchangeable; and (3) Projects may exceed the "watershed of concern" threshold, but the soil standard is mandatory. Following USFS's decision to move forward with the County Line project, Forest Guardians filed an administrative appeal in which they repeat the soil standard allegation included in their prior comment verbatim.

Whether these statements put USFS on notice of Forest Guardians' substantial evidence soil standard claim is a close question, and one complicated by Forest Guardians' apparent confusion of two independent provisions. Much of their argument is simply incorrect. There is no requirement that "no more than 15% of the soils in any watershed be detrimentally compacted, eroded, or displaced"; rather, the soil standard refers to any "land unit." USFS's 15% estimate, repeatedly cited by Forest Guardians, refers not to detrimental compaction, erosion, or displacement, but to disturbances – a term used in watershed analysis but not in the soil standard.

Ultimately, we conclude that Forest Guardians did not adequately present this issue in its administrative appeal and have thus forfeited it. See Pub. Citizen, 541 U.S. at 764. The above-quoted language was included in a section of Forest Guardian's comments (and later, its administrative appeal), entitled "Impacts to Water Quality," and not in the immediately preceding section entitled "Unstable Soils." Although they cite the EIS, Forest Guardians refer to USFS's discussion of watershed analysis, not its statements regarding the soil standard. The sole connection between the soil standard and Forest Guardian's statements to USFS is their use of the phrase "detrimentally compacted, eroded, or displaced." Read in context, Forest Guardians' statements simply cannot be understood as arguing that the record lacked substantial evidence to support USFS's conclusions regarding the soil standard. Instead, an administrative officer reading the complaint would conclude that Forest Guardians raised a challenge to USFS's watershed analysis, and simply inserted incorrect language from the soil standard.

Forest Guardians argue that their claim was properly presented because the Appeal Reviewing Officer ("ARO") discusses the soil standard in his recommendation to deny their administrative appeal. Although such evidence is normally considered highly probative, the references to the soil standard in this case do not lend credence to Forest Guardians claim that they properly presented the soil standard issue. The ARO first cites the soil standard in discussing a completely unrelated, now-abandoned claim advanced by Forest Service in its

- 17 -

administrative appeal: that USFS violated NEPA by failing to consider alternative road locations. The only other ARO reference to the soil standard simply points out that Forest Guardians are confusing the soil standard with watershed analysis. It is plain that the ARO interpreted this section of Forest Guardians' appeal as a watershed challenge. Neither ARO comment undermines our conclusion that Forest Guardians failed to adequately present their substantial evidence soil standard claim in their administrative appeal.

**IV**

Finally, Forest Guardians claim USFS failed to consider the impact of truck-related dust, noise, and diesel fumes on adjacent lands. NEPA requires the evaluation and disclosure of environmental impacts before undertaking "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), including impacts on private lands, see 40 C.F.R. § 1508.14 (noting that the phrase "'[h]uman environment' shall be interpreted comprehensively to include the natural and physical environment"). NEPA does not require that an agency discuss every impact in great detail; it simply requires a reasoned evaluation of the relevant factors. Utah Shared Access Alliance v. U.S. Forest Serv., 288 F.3d 1205, 1213 (10th Cir. 2002). Moreover, NEPA does not require that an agency give any particular weight to environmental considerations. That is, it "merely prohibits uninformed – rather than unwise – agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351

(1989). In reviewing the adequacy of an EIS, we determine whether "there is a reasonable, good faith, objective presentation of the topics," such that it "foster[s] both informed decision-making and informed public participation." Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1035 (10th Cir. 2001) (citations and quotations omitted).

Following the draft EIS, adjacent landowner and appellant K. Randal McKown submitted a comment to USFS expressing concern over the "noise, traffic and dust that a commercial [logging] operation of this magnitude will generate." Similarly, appellants Gilbert and Alice Duran commented that the "noise, dust, diesel exhaust and countless trucks will have a negative impact on all of us." USFS included these comments in the final EIS and, in response, noted that the project "would cause additional noise and activity adjacent to your property during project implementation." Moreover, in the body of the final EIS, USFS disclosed that the project "would have temporary effects to recreation users and private land owners adjacent to the proposed treatment areas, especially during the active timber sales with heavy truck traffic on the roads leading into the sale areas."

These statements adequately demonstrate that USFS considered the impacts of noise, dust, and fumes on private landowners, which are clearly encompassed by the "temporary effects" of "heavy truck traffic." NEPA imposes no obligation to use precise phrasing. By including this language in the final EIS, USFS put the

public on notice that this project, and its attendant truck traffic, would have negative consequences. This is not a case in which USFS made a finding of no significant impact. Instead, it acknowledged that the project would cause a number of significant environmental problems – including dust, noise, and diesel fumes – but, as noted by USFS, it opted to pursue the project anyway based on other considerations. Idiosyncratically, NEPA does not require more. Robertson, 490 U.S. at 351.

V

For the foregoing reasons, the decision of the district court is **AFFIRMED**. All pending motions are denied.

- 20 -

| Tool/Method | Precision Class | Frequency Method | Report Method | Responsible Person/Group | Estimated Annual Cost (A) $M | Which 6 Decisions are Addressed |
|---|---|---|---|---|---|---|
| (e) Southwestern willow flycatcher | A | 10% of habitat annually | M&E Report | Wildlife Biologist | 6.0(A) | 1,2,4 |
| Transects | | | | | | |
| (f) Black swift | A | All known nests every 3 years | M&E Report MCB Report | Wildlife Biologist/RMBO | 0.5(A) | 1,2,4 |
| MCB surveys | | | | | | |
| (g) Bats (sensitive species. | A | All known roosts every 5 years. * | M&E Report, DOW Report Project Reports, | Wildlife Biologist/DOW | 1.5(A) | 1,2,4 |
| Ocular Survey of roosts or mist netting, DOW Surveys | | | | | | |
| (h) MIS birds | A | Annually at state and national forest level.* | M&E Report, MCB Report, Project Reports | Wildlife Biologist/RMBO | 30.5 (A) | 1,2,4,5 |
| Point counts, nest search, presence surveys, MCB surveys | | | | | | |
| (i) MIS bird habitat | B | Annually, forest-wide.* | M&E Report, Project Reports | Wildlife Biologist | 15.0(A) | 1,2,4,5 |
| Photo interp/site visits/GIS/satellite imagery | | | | | | |
| (j) Deer and elk | A | Annually | M&E Report DOW Report | Wildlife Biologist/DOW | 0.5(A) | 1,2,4 |
| DOW Surveys | | | | | | |

#  Appendix

Monitoring Table, Table V-1 page V-18 to V-22

The following monitoring items *in bold italics* in Table V-1 would replace or be added to Chapter V, Monitoring and Evaluation Strategy, Annual Monitoring Plan and the Annual Monitoring and Evaluation Report, Monitoring Table, Table V-1 page V-18 to V-22 as a result of the proposed amendment. The rest of the Monitoring Table would not change.

## Table V-1 Monitoring

### Desired-Condition Category, Monitoring-Objective Statement, and CFR Citation if Legally Required

| Tool/Method | Precision Class | Frequency Method | Report Method | Responsible Person/Group | Estimated Annual Cost (A) $M | Which 6 Decisions are Addressed |
|---|---|---|---|---|---|---|

**Desired Condition for Biodiversity**

Objective: Viability – Monitor the change in occurrence of selected native species (Fine Filter). 36 CFR 219.27 and .19 (6) (page V-18)

| Tool/Method | Precision Class | Frequency Method | Report Method | Responsible Person/Group | Estimated Annual Cost (A) $M | Which 6 Decisions are Addressed |
|---|---|---|---|---|---|---|
| (a) Ripley milkvetch<br><br>Plots/transects first 5 years | A | Annually | M&E Report | Ecologist | 2.5(A) | 1,2,4,5 |
| (b) Rio Grande cutthroat trout, *chub and sucker*<br><br>*Stream surveys/DOW surveys* | A | *All core/refugia streams every 5 years* | M&E Report<br>*DOW Report* | Fish Biologist/DOW | 7.0(A) | 1,2,4 |
| (c) Boreal toad<br><br>*DOW Surveys* | A | All known and historic sites | M&E Report<br>*DOW Report* | Fish and Wildlife Biologist/DOW | 1.5(A) | 1,2,4,5 |
| (d) Peregrine falcon<br><br>*DOW Surveys* | A | All known nests annually | M&E Report<br>*DOW Report* | Wildlife Biologist/DOW | 1.5(A) | 1,2,4 |

2777

Rio Grande NF, EA, MIS Amendment

 **Appendix**

| Tool/Method | Precision Class | Frequency Method | Report Method | Responsible Person/Group | Estimated Annual Cost (A) $M | Which 6 Decisions are Addressed |
|---|---|---|---|---|---|---|
| (k) Deer and Elk Habitat<br><br>Habitat effectiveness models | B | Annually * | Project Reports | Wildlife Biologist | 3.0(A) | 1,2,4,5 |

### Objective: Viability – monitor the change in selected species habitat (Coarse Filter). 36 CFR 219.27

| Tool/Method | Precision Class | Frequency Method | Report Method | Responsible Person/Group | Estimated Annual Cost (A) $M | Which 6 Decisions are Addressed |
|---|---|---|---|---|---|---|
| (a) Plants listed in EIS (Sensitive Plants, Special Concern Plants, and Significant Communities section) other than Ripley Milkvetch.<br><br>Photo interp/site visits/GIS/satellite imagery | B | All occurrences every 10 years | M&E Report | Ecologist | 0.2(A) | 1,2,4,5 |
| (b) Snag-dependent species.<br><br>Photo interpretation/site visits/GIS/satellite imagery | B | Once every 5 years | M&E Report, Project Reports | Wildlife Biologist | 3.3(A) | 1,2,4,5 |
| (c) Animal TEPS except those addressed above and those that can be covered under the Riparian Wetland Objective.<br><br>Photo interpretation/site visits/GIS/satellite imagery | B | Once every 10 years | M&E Report | Wildlife Biologist | 1.0(A) | 1,2,4,5 |

Rio Grande NF, EA, MIS Amendment   2779