# United States Court of Appeals
## For the First Circuit

No. 08-1978

SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY,
and THE WILDERNESS SOCIETY,

Plaintiffs, Appellants,

v.

THOMAS WAGNER, in his official capacity as Forest Supervisor of
the White Mountain National Forest; ABIGAIL KIMBELL, in her
official capacity as Chief of the United States Forest Service;
EDWARD T. SCHAFER, in his official capacity as Secretary of the
United States Department of Agriculture; and the UNITED STATES
DEPARTMENT OF AGRICULTURE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Boudin, Selya and Stahl,
Circuit Judges.

Kristin A. Henry, with whom Eric E. Huber and Bradford W.
Kuster were on brief for appellants.
Charles R. Scott, United States Department of Justice,
Environment & Natural Resources Division, with whom Cynthia S.
Huber and Mark R. Haag, United States Department of Justice,
Environment & Natural Resources Division, and Ronald J. Tenpas,
Assistant Attorney General, were on brief for appellees.

February 6, 2009

**BOUDIN**, **Circuit Judge**.  The Sierra Club, along with two other conservation groups (for simplicity we refer only to the Sierra Club), challenges the Forest Service's approval of two forest resource management projects in the White Mountain National Forest ("Forest" or "WMNF"): the Than Forest Resource Management Project ("Than Project") and the Batchelder Brook Vegetation Management Project ("Batchelder Project").  The district court's decision, upholding the Forest Service, provides detailed background, Sierra Club v. Wagner, ___ F. Supp. 2d ___, 2008 WL 2336902, at *1-5 (D.N.H. Jun. 6, 2008), which we summarize here.

The Forest Service, an agency of the U.S. Department of Agriculture, is responsible for national forests.  The National Forest Management Act ("NFMA"), 16 U.S.C. §§ 472a, 521b, 1600 et seq. (2006), provides for management of national forests at two levels, the programmatic (or plan) level and the project level (where the Forest Service implements the broader programs and goals laid out in the forest plan).  Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 729-30 (1998).

All projects within a forest must comply with the overall plan for that forest, 16 U.S.C. § 1604(i), which is revised periodically, id. § 1604(f)(5).  The governing White Mountain National Forest Land and Resource Management Plan was most recently revised and adopted in September 2005 ("the 2005 Plan").  The 2005 Plan was revised pursuant to the 1982 forest service regulations

-2-

("the 1982 rules"), which could still permissibly be considered for Plan revisions when the new plan was adopted. See 36 C.F.R. § 219.35(b).

The White Mountain National Forest covers almost 800,000 acres in northern New Hampshire and western Maine. The governing 2005 Plan promotes multiple uses for the Forest including recreation, timber harvesting, and preservation of wildlife and wilderness, as required by the NFMA. 16 U.S.C. §§ 1604(a), (e). The 2005 Plan classifies approximately 281,000 acres in the WMNF as appropriate for harvesting timber, but currently harvesting is allowed only on roughly 3,400 acres annually, a tiny fraction of the forest.

During the 2005 Plan revision process, the land was inventoried to determine whether it qualified as "roadless." 36 C.F.R. § 219.17(a) (1983). In the eastern United States, to qualify as roadless, land must meet certain environmental standards including very few constructed roads or recent timber harvesting.[1] Twenty-seven areas, totaling 403,000 acres, met these criteria and comprise inventoried roadless areas ("IRA's"), which can be designated by Congress as Wilderness Areas, thereby affording the

---

[1]To qualify requires a natural, untrammeled appearance; improvements in the area must be disappearing or muted; the location must be conducive to perpetuating wilderness values; the area may contain no more than one-half mile of improved road for each 1,000 acres; and only twenty percent or less of the area may have been the subject of timber harvesting within the past ten years. Forest Serv. Handbook 1909.12, § 7.12 (1992).

lands special protection, 16 U.S.C. § 1132(b).  The Forest Service recommended that Congress so designate 34,500 acres over and above the 114,000 acres previously protected.

After adoption of the 2005 Plan, the Forest Service evaluated various management areas within the Forest to determine what new projects were required to achieve the 2005 Plan goals.  It determined, for the areas encompassing the Than and Batchelder projects, that more diverse habitats, including new vegetation in younger age classes, were needed and that it would be beneficial to harvest some mature trees to create room for younger trees (creating what is known as early successional habitat).

Ultimately the Forest Service proposed to allow timber harvesting of approximately 929 acres in the Than project, creating up to 231 acres of early successional habitat.  Some existing roads would receive maintenance or reconstruction, and a 500 foot section of new road was planned.  Part of this project would affect the Wild River Inventoried Roadless Area, including 464 acres of timber harvesting in that area.

The other proposed action, the Batchelder Project, involved harvesting on 380 acres, including 139 acres within the South Carr Mountain Inventoried Roadless Area.  The Project requires no new road construction, but does authorize maintenance on approximately three miles of road, one-half mile of which is located in the South Carr Mountain IRA.

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., obligates agencies such as the Forest Service to evaluate the environmental impacts of its proposed actions. Dubois v. U.S. Dep't of Agriculture, 102 F.3d 1273, 1284 (1st Cir. 1996), cert. denied sub. nom. Loon Mtn. Recreation Corp. v. Dubois, 521 U.S. 1119 (1997). To comply with NEPA, the Forest Service was first required to determine whether either the Than or the Batchelder Project would have a significant environmental impact. 40 C.F.R. § 1501.4 (2007); Save Our Heritage, Inc. v. F.A.A., 269 F.3d 49, 57 (1st Cir. 2001).

A detailed environmental impact statement ("EIS") is required whenever proposed actions will "significantly affect the quality of the human environment." 42 U.S.C. § 4332; 40 C.F.R. §§ 1502.1, 1502.14; Dubois, 102 F.3d at 1285. If uncertain about impact, the agency may start with a less detailed Environmental Assessment ("EA"); 40 C.F.R. § 1501.3. If the EA finds a significant impact, a full EIS must be prepared; if not, the agency makes a "Finding of No Significant Impact" ("FONSI"), which exhausts its obligation under NEPA. Id. §§ 1501.4, 1508.9, 1508.13.

The Forest Service prepared an EIS in connection with the 2005 Plan revision and it was also required to prepare either an EIS or EA for both the Than and Batchelder projects. 40 C.F.R. § 1501.4; see also Blue Mountains Biodiversity Project v. Blackwood,

-5-

161 F.3d 1208, 1214 (9th Cir. 1998), <u>cert. denied</u>, 527 U.S. 1003 (1999).  Under the 2005 Plan, specific projects' environmental analyses may incorporate by reference ("tier") information that is in the Plan EIS, so an EA need not start from scratch.  40 C.F.R. § 1508.28.

The Forest Service prepared an initial EA for the Than Project in May 2006 but, after an administrative appeal, issued in November 2006 a revised EA for public comment.  After receiving comments and after an injunction deferred the operation of new Forest Service rules relied on in the November 2006 draft, the Forest Service revised the EA and issued the final Than EA in April 2007.

Despite certain possible adverse effects of the Than Project on the Wild River Inventoried Roadless Area--including sediment inputs to streams, some soil disturbance, and effects on stream temperature--the Forest Service concluded that the project would

> not significantly alter the character of the area or the qualities which qualified it for inclusion in the inventory . . . because the harvests are of limited intensity and minimal road systems will be used [and that there would be no] lasting or significant effect on the roadless character of the area.

It issued a FONSI and thereafter denied the Sierra Club's administrative appeal.

As for the Batchelder project, an initial EA draft was withdrawn when the initial Than EA was set aside; a revised EA was issued in December 2006 for public comment followed by a final EA and a revised decision notice with a FONSI in May 2007. The FONSI conceded certain potential adverse effects (on wildlife and possible sedimentation of streams), but concluded that no significant impact would result on the South Carr Mountain Area's roadless or wilderness characteristics. A Sierra Club administrative appeal was thereafter denied.

In August 2007, the Sierra Club filed a complaint in the district court challenging the Than Project. It amended its complaint to incorporate claims regarding the Batchelder Brook Project in October 2007. On cross-motions for summary judgment, the district court upheld the Forest Service's actions, granted the Forest Service's motion and denied Sierra Club's. We denied a stay pending appeal but expedited the case.

On appeal, Sierra Club claims error by the Forest Service in several respects. We review questions of law de novo, WorldNet Telecommunications, Inc. v. Puerto Rico Telephone Co., 497 F.3d 1, 5 (1st Cir. 2007), but are deferential to the agency in its interpretation of its own rules, Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44 (1984), and in judgment calls as to the likely impact of proposed actions. Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir.

-7-

1997).  The latter, reflected in the FONSI findings, are to be upheld unless arbitrary and capricious.  <u>Marsh</u> v. <u>Oregon Natural Res. Council</u>, 490 U.S. 360, 374, 376 (1989); <u>see</u> <u>also</u> 5 U.S.C. § 706(2)(A).

Sierra Club argues first that the Forest Service erred by applying the "best available science" standard found in the Forest Service rules, adopted in 2000, <u>see</u> 36 C.F.R. § 219.35(a) (2001), to its evaluation of the Than and Batchelder Brook projects, rather than a set of rules adopted in 1982.  One might think from the name that "best available science" is an unexceptionable standard, but according to Sierra Club, the 1982 rules provided a set of precise tests for evaluating a project's impact on species that are more rigorous and were intentionally weakened by the 2000 rules.

Its brief provides a short description of the difference and, as the characterization is not denied by the Forest Service's brief, we will assume it to be true.  <u>See</u> <u>Forest Watch</u> v. <u>U.S. Forest Serv.</u>, 410 F.3d 115, 116-17 (2d Cir. 2005).  However, Sierra Club's brief fails to explain whether or how the allegedly more rigorous standards of the 1982 rules would likely have altered the Forest Service's ultimate evaluation of the two projects.  This may not derail the argument but it reduces one's enthusiasm for it.

In all events, Sierra Club contends that the 1982 rules apply in this case, and understanding the argument requires a brief excursion.  When the new 2000 NFMA rules were announced, their

-8-

transition provision deferred many of the new rules until November 2003 (a date thereafter extended)[2]; but the provision said that effective immediately the Forest Service "must consider the best available science in implementing . . . the current plan." 36 C.F.R. § 219.35(a). The parties take this language to supercede the allegedly more stringent 1982 rules on species evaluation, but disagree as to whether the transition provision covers the two projects in issue here.

Sierra Club argues that the plain language of the transition provision applies only to forest plans that were "current" when the transition provision was adopted in 2000. See Utah Environmental Congress v. Troyer, 479 F.3d 1269, 1272-74 (10th Cir. 2007). And, the argument goes, the 2005 Plan for the forest (which had been implemented when the two projects were approved) was not "current" in 2000. The Forest Service counters that Sierra Club waived this argument because it was not presented to the district court.

Ordinarily, arguments not raised in the district court cannot be raised for the first time on appeal. E.g., Boston

---

[2]The extensions continued until January 2005 when a revised set of rules were adopted, which (according to Sierra Club) are even weaker in protecting the environment; but they have been enjoined nationwide pendente lite, Citizens for Better Forestry v. U.S. Dep't of Agriculture, 481 F. Supp. 2d 1059, 1100 (N.D. Cal. 2007), so prior rules, including the 2000 transition provision, seemingly remain in effect for the present. See Action on Smoking & Health v. Civil Aeronautics Bd., 713 F.2d 795, 797 (D.C. Cir. 1983).

Celtics Ltd. P'ship v. Shaw, 908 F.2d 1041, 1045 (1st Cir.1990).

Sierra Club agrees that it did not raise its "current plan" argument in the district court but says that it did there oppose the "best available science" standard on other grounds and this is enough to allow us to consider its new legal theory in support of the same result. This is a misunderstanding of the requirements for preserving issues for review.

We can affirm a judgment on a legal ground not relied upon in the district court, Plymouth Sav. Bank v. I.R.S., 187 F.3d 203, 209-10 (1st Cir. 1999)--after all, why send the case back if the result was right--but it is altogether different to reverse a judgment on a ground never raised in the lower court. See In re Boston Reg'l Med. Ctr., 291 F.3d 111, 125 n.16 (1st Cir. 2002). We may ourselves choose to consider newly minted arguments from the parties, or devise them ourselves, but this is not an entitlement of the parties.[3] See, e.g., United States v. La Guardia, 902 F.2d 1010, 1013 (1st Cir. 1990)).

In sum, the Sierra Club has forfeited the argument, and we decline to consider it. The 2005 rules have been enjoined but

---

[3]For example, we may choose to hear an argument not raised below in "cases that involv[e] important constitutional or governmental issues [which are] exceptional . . . and, as such [warrant] a full legal treatment of all legal issues involved, whether squarely introduced by the parties or not." TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 930 (1st Cir. 1995) (citing Nat'l Ass'n of Social Workers v. Harwood, 69 F.3d 622, 628 (1st Cir.1995)).

to return to the 1982 rules, instead of the 2000 transition provision, is not appealing where, as here, Sierra Club has not troubled to explain why the outcome would change (delay aside) if the 1982 rules were applied.  Nor do we find the Forest Service's reading of the transition provision <u>patently</u> wrong, a circumstance that might help persuade us to excuse the forfeiture.

<u>Utah Envtl. Cong.</u> v. <u>Troyer</u>, 479 F.3d 1269, 1281 (10th Cir. 2007), agrees with Sierra Club's belated argument--indeed, probably prompted it--but <u>Troyer</u> is quite possibly wrong in thinking the word "current" can yield only one meaning.  And <u>Troyer</u> is at odds with a 2004 interpretive rule issued by the Forest Service, 69 Fed. Reg. 58055, 58057 (2004),[4] ordinarily entitled to "substantial deference" where the subject is "the agency's interpretation of its own regulations."  <u>N. Wind, Inc.</u> v. <u>Daley</u>, 200 F.3d 13, 17 (1st Cir. 1999).

Next, Sierra Club contends that the Than Project EA was based on the Management Indicator Species Provision of the 2005 rules, 36 C.F.R. § 219.14(f) (2005), which were enjoined nationwide in March 2007.  <u>See</u> <u>Citizens for Better Forestry</u>, 481 F. Supp. 2d at 1100.  Admittedly, the final Than Project EA says <u>once</u> that "[t]he analysis of MIS [the species analysis] was undertaken in the

---

[4]The rule, directly addressing the claim now advanced by the Sierra Club as to the meaning of its transition rule, states that "the best available science" standard should be used in "implementing national forest land management plans."  69 Fed. Reg. at 58,056.

context of 36 C.F.R. § 219.14(f)" [which is only found in the enjoined 2005 rules].  Below, the Forest Service disclaimed this reference as a typographical error--and the district court agreed.

It appears that when the revised draft Than EA was published for public comment in 2006, the 2005 rules had been adopted as a rewriting of the long deferred 2000 rules.  Once the injunction against the 2005 rules issued, the Forest Service removed almost all of the references in the draft to the 2005 rules and issued the final Than Project EA shortly thereafter, relying instead on the 2000 transition provision's "best available science" standard.  But, says the Forest Service, the one reference to the 2005 rules was missed in the clean-up.

This is hardly the "post hoc rationalization" claimed by Sierra Club, see NRDC v. U.S. Envtl. Prot. Agency, 824 F.2d 1258, 1286 n.19 (1st Cir. 1987), since the agency itself identified the typographical error as such in denying Sierra Club's administrative appeal and the explanation is therefore part of the administrative record.  Nor does Sierra Club provide any reason to doubt the Forest Service's explanation.  So the citation may fairly be treated as a typographical error; but this is not automatically dispositive.

Had the revised draft Than EA relied on the 2005 rules in any way critical to the outcome, Sierra Club might well have an argument--regardless of missed citations--that the Than Project EA

-12-

could not be saved by an overnight mechanical deletion of specific references. But whatever weakening attended the 2005 rules, Sierra Club has not shown that those rules were <u>pertinently</u> less demanding than the 2000 rule's "best available science" standard. Instead, the distinctions it draws are between the 1982 rules and the 2000 rules, which is not the relevant comparison.

Sierra Club also contends that because the 2005 rules were enjoined by a district court, the 1982 rules went back into effect. Had we in fact found that the 2000 rules did not apply, this argument would have merit. See <u>Action on Smoking & Health</u>, 713 F.2d at 797 (holding that where one agency rule is invalidated the previous rule in force applies). However, because we hold the best available science standard applied, that portion of the 2000 rules went back into effect when the 2005 rules were enjoined.

Sierra Club next says that the EAs were inconsistent in identifying which rules governed and did not explicitly use the "best available science" standard on which the Forest Service now relies. Sierra Club's argument rests heavily on the Second Circuit's opinion in <u>Forest Watch</u> v. <u>U.S. Forest Service</u>, 410 F.3d 115, 119 (2d Cir. 2005), which held that Forest Service's failure to "consider or mention the 'best available science' standard" in implementing two site-specific projects amounted to conduct that was arbitrary and capricious.

-13-

In fact, the Batchelder EA did refer to the best evidence standard, the Forest Service says that the Than EA complied with it in substance and the FONSIs for the projects state the Forest Service relied on the "best available science"--all consistent with the Forest Service's view of the 2000 transition provision. By contrast, in Forest Watch, the EAs and the FONSIs made no reference to "best available science" and, more significant, there were repeated citations to the 1982 rules. Forest Watch, 410 F.3d at 119.

On top of all this, it is not clear why references to "best available science" matter: unlike Forest Watch, there is no indication here that the Forest Service invoked the 1982 rules, allegedly misapplied them and is now claiming that it used the newer standard instead. Of course, Sierra Club could point us to some specific substantive dispute and then argue the science relied upon by the agency was not "the best." But Sierra Club identifies no such controversy in this case.

Sierra Club next argues that even if the 1982 rules did not apply to the Than and Batchelder projects by their own force, they apply because the Forest Service chose to revise the 2005 Forest Plan so as to incorporate the 1982 rules for future site-specific projects. The Forest Service agrees that the conclusion would follow if the premise were correct, see Troyer, 479 F.3d at

-14-

1282; but it denies that the 2005 Plan adopted the 1982 rules as requirements for subsequent projects like Than and Batchelder.

The district court found that the 2005 Plan did not "specifically incorporate" the 1982 rules and so they did not apply under an "adoption" theory to the Than and Batchelder Brook projects. Wagner, 2008 WL 4560669, at *11. The 2005 Plan does refer to the 1982 rules on several different occasions, notably several references to "MIS Monitoring." But the 2005 Plan does not say that the 1982 rules govern plan projects; in fact, it states that "[t]he regulations do not require MIS monitoring on every project."

In addition to its "wrong rules" arguments, Sierra Club objects to the Forest Service's substantive finding that the Than and Batchelder projects would have no significant impact on the environment. This is an argument that one might think could have promise because the two projects are not trivial and the Forest Service itself conceded that there would be some negative effects. But Sierra Club's own arguments do not seriously undermine the FONSI findings.

A substantive attack on an impact assessment is not easy. The Council on Environmental Quality ("CEQ") and case law standards for "significance" are (perhaps inevitably) general, and courts have good reason to take seriously the deference due to the agency in technical and scientific matters. Kleppe v. Sierra Club, 427

-15-

U.S. 390, 410 n.21 (1976); see also Sierra Club v. Marsh, 769 F.2d 868, 871 (1st Cir. 1985) (Breyer, J.). Ordinarily, the attack has to start by explaining just what harms might result and make, in the Third Circuit's words,

> at least some effort . . . to advance specific allegations that the agency . . . misinterpreted the evidence, overlooked certain testimony, or unreasonably reached its 'no significant impact determination.'

Lower Alloways Creek Twp. v. Pub. Serv. Elec. & Gas Co., 687 F.2d 732, 747 (3d Cir. 1982).

The Forest is almost 800,000 acres and has a history of mixed uses included timber harvesting. The Than Project involves timber harvesting, subject to maximum amounts, on 929 acres, with clear cutting for new timber on up to 231 acres; Batchelder Brook Project involves harvesting on 380 acres; some of the harvesting in each case is in inventoried roadless areas. Than requires 500 feet of new road; Batchelder none. On an order of magnitude basis these do not seem like negligible enterprises but--without more--neither are they self-evidently "significant" in potential negative impact.

Yet Sierra Club makes only a single concrete point as to immediate harm: it argues that harvesting, especially clear cutting for new growths, creates visual scars visible even from outside the area; that the Forest Service concedes that the effects could endure for a decade or two; and that in California v. Block, 690 F.2d 753, 763 (9th Cir. 1982), the court said that "[t]he 'critical

-16-

decision' to commit [roadless] areas for nonwilderness uses, at least for the next ten to fifteen years, is 'irreversible and irretrievable.'"

Block, very different from this case, involved a decision by the Forest Service to "command that [certain roadless areas nationwide] be used for non-wilderness purposes" without troubling to "assess the wilderness value of each area [that would have been allocated] and to evaluate the impact of Nonwilderness designations upon each area's wilderness characteristics and value."  Id. at 764.  Here we have a narrow judgment that neither of the two precisely defined projects will have a "significant" adverse effect.

In estimating duration, the Forest Service was talking only of the visual effect from clear-cutting, which diminishes over time and a more complete version of its verdict is that the effects "should not be noticeable to the untrained eye within a decade or two."  If so, the visual blight would begin to be dissipating almost from the start.  So, too, harvesting would disturb solitude; but this would be primarily limited to the period in which harvesting was occurring.

It is perhaps more troubling that the Forest Service EAs also conceded that there would or could be negative effects from sedimentation in waters due to erosion and other effects from logging and that disturbances could harm both water and wildlife.

-17-

Still, mitigating measures were promised and are relevant, e.g., Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d 678, 682 (D.C. Cir. 1982), and Sierra Club's brief makes no effort to develop an attack on their adequacy.

Sierra Club does argue that the Forest Service failed to consider the impact the projects would have on so-called "roadless characteristics," which are identified in the 2001 Roadless Area Conservation Rule ("Roadless Rule"), 36 C.F.R. § 294. The Forest Service says, without any answer from Sierra Club, that the Roadless Rule does not apply to these projects.[5] Sierra Club concedes in its reply brief that the Roadless Rule merely identifies concerns that the Forest Service must address.

The so-called roadless characteristics to which Sierra Club points are a catch-all list of potential concerns,[6] and some

_____

[5]The Forest Service says that the Roadless Rule applies only to areas so designated at the time the new regime was established in November 2000 or before, 66 Fed. Reg. at 3272, and that the IRAs involved in Than and Batchelder were not included.

[6]They are as follows:
(1) high quality or undisturbed soil, water, and air;
(2) sources of public drinking water;
(3) diversity of plant and animal communities;
(4) habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, undisturbed areas of land;
(5) primitive, semi-primitive nonmotorized and semi-primitive motorized classes of dispersed recreation;
(6) reference landscapes;
(7) natural appearing landscapes with high scenic quality;
(8) traditional cultural properties and sacred sites; and
(9) other locally identified unique characteristics.

were certainly considered (soil and water quality, appearance) while others (e.g., sacred sites) are not even alleged to be of issue. It is up to Sierra Club to identify important considerations that were presented by the record but were not seriously addressed in an EA. The generality of the argument made renders it ineffective.

Sierra Club next says that the Forest Service failed to consider whether the timber harvesting would disqualify any of the land involved from future recommended designation for wilderness protection that Congress may afford. The Forest Service fairly responds that harvesting does not automatically preclude such a designation[7] and that the South Carr Mountain area was considered for designation despite past timber harvesting but thought unsuitable for other reasons.

Further, the 2005 Plan (to whose analysis the Than and Batchelder projects were tiered) contains even more specific analysis, including explicit findings that the areas in question were inappropriate for future wilderness designation. See Heartwood, Inc. v. U.S. Forest Serv., 380 F.3d 428, 433 (8th Cir.

66 Fed. Reg. 3,244, 3272 (Jan. 12, 2001).

[7]The Forest Service has recognized in its own handbook the difference between Eastern and Western forests, with Eastern land with up to 20 percent of a given area harvested for timber still eligible for wilderness designation. FSH 1909.12 ch. 71.12 (2005). Land is eligible in the west for wilderness designation only in "areas where logging and prior road construction are not evident." FSH 1909.12 ch. 71.1, 71.11 (2005).

2004) (EA permissible when tiered to broader plan that did address impact). And contrary to Sierra Club's assertion that wildlife was not taken into consideration, the Forest Service explicitly looked at the impact on a host of species.

Independent of concrete harms from this project, Sierra Club makes a set of arguments that the projects are significant because of their "context" and ostensibly controversial nature. One might be surprised to discover that even if a particular project threatens no significant environmental harm, the decision to permit it may still be significant, depending on "contextual factors." Yet, the regulations do suggest such a reading. 40 C.F.R. § 1508.27 (2008). Sierra Club argues that the Forest Service failed to consider that "these projects are the first to authorize commercial logging and road building in an IRA in the eastern United States and the first to enter a roadless area under the 'Forest Plan IRAs' theory, since promulgation of the Roadless Rule." However, such a broad definition of context is explicitly disclaimed by the relevant regulation, which states that the relevant context for "site specific action[s] . . . would usually depend upon the effects in the locale rather than in the world as a whole." 40 C.F.R. § 1508.27 (2008).

Its other argument is that the effects of the projects were "controversial," requiring the completion of an EIS. But once again, the highly general character of this claim deprives it of

force.  We are not told where the controversy lies, or even amongst whom there is a meaningful dispute.  As best we can tell, the controversy is that the Sierra Club disagrees with the conclusions the Forest Service reaches, which is not sufficient by itself to warrant an EIS.  Cf. Native Ecosystems Council v. United States Forest Serv., 428 F.3d 1233, 1240 (9th Cir. 2005).

The Forest Service did no EIS but also did not brush off environmental concerns.  Its EAs that are lengthy by any standard (appendices aside, the Than EA is 194 pages and the Batchelder EA is 146 pages) addressing in detail the environmental concerns that might arise before concluding that, as subject to intended mitigation, the impacts were not significant.  The substantive decisions thus did not ignore the possible environmental effects.

The Forest Service's EA discussion makes clear that it considered all of the arguable categories of harm--such as visual effects, noise, soil effects, impact on wildlife, road and bridge construction or maintenance, and impact on watershed--and that it addressed and answered claims concerning precedential significance, impact on wilderness designation and the impact of the roadless rule.  Possibly little was saved by doing EAs of this character instead of EISs, but it is not clear that anything was lost.

Sierra Club ends with a procedural argument that the Forest Service violated NEPA by not making the FONSIs available for thirty days of notice and comment.  CEQ regulations require

that draft FONSIs be made available for public review and comment, inter alia, when "[t]he proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement."  40 C.F.R. § 1501.4(e)(2)(i) (2008).  Sierra Club says that the projects here meet the test for such notice.

Whether or not this is so, the evident intent to allow public comment on FONSI findings seems to have been satisfied here in spades.  An agency that adopts a FONSI without seeking input can be expected at least to accept comments before acting on the merits of a decision; but here both EAs were circulated in draft form and comments solicited even before any FONSI was finally adopted.  Why this does not satisfy the purpose of the thirty day rule Sierra Club does not explain.

Affirmed.