**FOREST GUARDIANS and Carson Forest Watch, Plaintiffs–Appellants,**

v.

**UNITED STATES FOREST SERVICE, Defendant–Appellee.**

No. 06–2306.

United States Court of Appeals, Tenth Circuit.

Aug. 26, 2009.

Steven Sugarman (Alletta Belin with him on the brief), Belin & Sugarman, Santa Fe, NM, for Plaintiffs–Appellants.

David C. Shilton, Attorney, Environment & Natural Resources Division, Department of Justice (Ronald J. Tenpas, Assistant Attorney General; Andrew A. Smith and Mark R. Haag, Attorneys, Environment & Natural Resources Division, Department of Justice; Kathryn Toffenetti and Mary Ann Joca, Office of General Counsel, U.S. Department of Agriculture, with him on the brief), Washington, D.C., for Defendant–Appellee.

Before McCONNELL, SEYMOUR, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

Plaintiffs–Appellants Forest Guardians and Carson Forest Watch (collectively "Forest Guardians") challenge the United States Forest Service's approval of a timber sale and restoration project in New Mexico's Carson National Forest, claiming violations of the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq., and Forest Service regulations. Forest Guardians sought declaratory and injunctive relief; the district court denied them relief and granted judgment in favor of the United States Forest Service ("USFS"). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

As part of the National Forest System, the Carson National Forest is maintained under a land and resource management plan (the "Carson Forest Plan"), pursuant to the NFMA, 16 U.S.C. § 1604. The Carson Forest Plan was adopted in 1986 and "sets forth broad, programmatic management direction for the Carson National Forest." J.App. at 151; 16 U.S.C. § 1604(e). The Carson Forest Plan includes a monitoring program that provides that Management Indicator Species ("MIS") be identified and that five years of baseline monitoring of each MIS be undertaken, followed by periodic monitoring of MIS population and trends. MIS are analogous to the storied canaries of coal mines; "[t]hey are a 'bellwether' for other species that have the same special habitat needs or population characteristics and serve as a proxy for determining the effects of management activities on other species." *Utah Envtl. Cong. v. Bosworth* (*UEC II*), 439 F.3d 1184, 1190 (10th Cir. 2006) (citation and internal quotation marks omitted). The Carson Forest Plan, as amended, identified eleven wildlife species, including the Abert's squirrel,[1] as MIS used to monitor the condition of the forest's ecosystems. These species were "considered to be representative [of] a variety of other species ... and were determined to reflect the habitat needs for the majority of the forest's species." J.App. at 214. They "were selected because population changes are believed to indicate the effects of management activities that occur [in] the forest." *Id.*

To implement the Carson Forest Plan, the USFS approves plans and projects for specific areas of the Carson National Forest. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). Such projects must be consistent with the applicable forest plan. *Utah Envtl. Cong. v. Bosworth* (*UEC III*), 443 F.3d 732, 737 (10th Cir. 2006) (citing the NFMA "consistency clause," 16 U.S.C. § 1604(i)). The Agua/Caballos Project ("A/C Project"), at issue here, consists of site-specific silvicultural treatments,[2] timber cutting and sales,

---

1. David R. Patton, *A Model to Evaluate Abert Squirrel Habitat in Uneven–Aged Ponderosa Pine*, 12 Wildlife Soc'y Bull. 408, 408 (1984) ("The Abert squirrel has been described as unique among North American mammals. This uniqueness is exemplified by its conspicuous tufts of hair on its ears, by variation in the color pattern of isolated populations, and by its close association with a single tree species—ponderosa pine ...." (citation omitted)).

2. *See generally McGraw–Hill Dictionary of Scientific and Technical Terms* 1935 (6th ed.2003) (defining "silviculture" as "[t]he theory and practice of controlling the establishment, composition, and growth of stands of trees for any of the goods and benefits that they may be called upon to produce"); *see also id.* at 2014 (defining "stand" as "[a] group of plants, distinguishable from adjacent vegetation, which is generally uniform in species composition, age, and condition"); XVI *The Oxford English Dictionary* 489 (2d ed.2001) (defining "stand" as "[a] standing growth or crop ... spec. one of trees").

and related activities. The A/C Project was proposed in 1992, and it was first approved by the USFS in June 2002. Several parties, including the Appellants here, successfully appealed the approval on the grounds that the plan's MIS analysis was incomplete. The A/C Project was remanded to the USFS to complete the MIS analysis, i.e., to evaluate the effects of the project on the identified MIS, and to solicit further public comment and issue a new decision.

After the USFS undertook an updated forest-wide MIS assessment and sought comments, the revised A/C Project was approved in April of 2004 in a Record of Decision (the "ROD"). On July 12, 2004, Forest Guardians filed an administrative appeal of the USFS's final approval of the A/C Project; that appeal was rejected in August of 2004. Forest Guardians then filed this action in federal district court alleging that the USFS's approval of the A/C Project violated the NFMA, the National Environmental Protection Act ("NEPA"),[3] and USFS regulations. The district court denied relief and affirmed the USFS's approval of the A/C Project. Forest Guardians now appeals.

## II. DISCUSSION

### A. Standard of Review

Because the NFMA does not provide a private right of action, we review the USFS's approval of the A/C Project as a final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 et seq. *UEC III*, 443 F.3d at 739. The district court's decision is considered de novo, but we will not overturn the decision of the USFS "unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* (quoting 5 U.S.C. § 706(2)(A)).

While administrative agencies generally are afforded a presumption of regularity, an agency's decision will nonetheless be arbitrary and capricious if the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Furthermore, we must determine whether the disputed decision was based on consideration of the relevant factors and whether there has been a clear error of judgment. Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.

*Id.* (alterations, citations, and internal quotation marks omitted).

### B. Approval of the A/C Project and Administrative Exhaustion

#### 1. Forest Guardians' Failure to Exhaust

In 1982, the USFS revised its planning regulations ("the 1982 Rules"), 36 C.F.R. pt. 219 (1999), which govern USFS management at both the program and project levels. In November 2000, the USFS significantly amended these regulations and replaced them with the 2000 planning rules, codified at 36 C.F.R. pt. 219 (2001). National Forest System Land and Resource Management Planning, 65 Fed.Reg. 67,514, 67,568–81 (Nov. 9, 2000); *see UEC III*, 443 F.3d at 737. Rather than being immediately promulgated, these new regulations provided that from November 9, 2000, until the promulgation of a new, final rule, the USFS "must consider the best available science [or 'BAS'] in implementing ... [a forest] plan." 36 C.F.R.

---

**3.** Forest Guardians does not pursue its NEPA claim on appeal.

§ 219.35(a) (2001) [hereinafter 2000 BAS standard]. These transition provisions ultimately remained effective until new rules were implemented in January 2005; similarly, these new rules prescribe that the USFS "must take into account the best available science." *See* 36 C.F.R. §§ 219.11 (2008); 70 Fed.Reg. 1023, 1027 (Jan. 5, 2005).

As thoroughly explained by the district court, Forest Guardians had argued to the agency that the 1982 Rules were applicable to the USFS's evaluation and approval of the A/C Project. J.App. at 79, 83. Forest Guardians adopted the same position in its initial filings with the district court. *See* Aplt. Opening Br. Attach. at 31. Now, on appeal, Forest Guardians does not dispute the district court's contrary, accurate conclusion that the 2000 BAS standard, rather than the 1982 Rules, applies to the A/C Project; "any projects proposed during the transition period must conform with the best available science standard set forth in the 2000 transition provisions." *See UEC III*, 443 F.3d at 746–47 (concluding, based on the USFS's interpretive rule adopted in 2004, that "during the transition period between November 2000 and promulgation of a final rule, the Forest Service should use the 'best available science' under § 219.35(a) for project decisions" (internal quotation marks omitted)).[4] Rather, Forest Guardians' primary argument is directed toward the USFS's alleged failure to consider and apply the BAS standard in evaluating the project and the inequity of expecting Forest Guardians to present arguments regarding the BAS standard during the administrative appeal process.

We previously have explained why the applicability of the 1982 Rules versus the 2000 BAS standard can be an important distinction in the evaluation of forest plans:

> Deciding whether the 1982 regulations apply to the Project … is important because the 1982 regulations and the 2000 transition provisions contain key differences governing species monitoring. The 1982 rules, for example, require the Forest Service to monitor the "population trends of the management indicator species" and determine "relationships to habitat changes." 36 C.F.R. § 219.19(a)(6). And we have held that these obligations apply to project level as well as plan level management actions. Conversely, the 2000 transition provisions contain no such explicit language governing monitoring but merely require "the responsible official to consider the best available science in implementing" a forest plan. 36 C.F.R. § 219.35(a), (d) (2001); 65 Fed.Reg. 67,-514, 67,579 (Nov. 9, 2000).

*UEC III*, 443 F.3d at 744–45 (alterations and citation omitted); *see also UEC II*, 439 F.3d at 1190 (quoting *Forest Watch v. U.S. Forest Serv.*, 410 F.3d 115, 117 (2d Cir.2005), for the proposition that "the standards of the 1982 Rules and the 2000 Transitional Rule are—at least—distinct"); *Sierra Club v. Wagner*, 555 F.3d 21, 25 (1st Cir.2009) ("One might think from the name that 'best available science' is an unexceptionable standard, but according to [the plaintiff], the 1982 rules provided a set

---

**4.** Because this September 2004 interpretive rule was not issued until after the administrative appeal process was completed in this case, we point to that rule only as further support for the now-undisputed conclusion that the 2000 BAS standard was applicable to the A/C Project. National Forest System Land and Resource Management Planning; Use of Best Available Science in Implementing Land Management Plans, 69 Fed.Reg. 58,-055, 58,055–56 (Sept. 29, 2004). The interpretative rule clearly prescribed that "the 1982 rules are no longer applicable for projects proposed during the transition period." *UEC III*, 443 F.3d at 747.

of precise tests for evaluating a project's impact on species that are more rigorous and were intentionally weakened by the 2000 rules."). This court and others have run into confusion in applying the 2000 transition provisions. *UEC III*, 443 F.3d at 745 (citing cases).

Forest Guardians asserts that the USFS failed to properly apply the 2000 BAS standard in planning and approving the A/C Project. Forest Guardians further argues that the A/C Project's approval would be affected by the "key differences" between that standard and the 1982 Rules. *Cf. Wagner*, 555 F.3d at 25–26 (finding that the plaintiff had forfeited its argument regarding the applicability of the 1982 Rules when it had neither raised the argument to the district court nor explained "whether or how the allegedly more rigorous standards of the 1982 rules would likely have altered the Forest Service's ultimate evaluation of the two projects"). The district court, however, determined that because Forest Guardians failed to raise the BAS argument during the administrative appeal process—instead arguing that the 1982 Rules applied—Forest Guardians failed to exhaust this claim, as is necessary for judicial review. The district court found that it lacked subject matter jurisdiction over the BAS argument. We review de novo the district court's jurisdictional conclusion. *Urban ex rel. Urban v. Jefferson County Sch. Dist. R–1*, 89 F.3d 720, 724 (10th Cir.1996).

▮▮▮ Plaintiffs must exhaust available administrative remedies before the USFS prior to bringing their grievances to federal court. 7 U.S.C. § 6912(e);[5] 36 C.F.R.

§ 215.21. To satisfy the exhaustion requirement, plaintiffs "generally must 'structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration.'" *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1170 (10th Cir.2007) (internal quotation marks omitted) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004)). "Claims not properly raised before an agency are waived, unless the problems underlying the claim are 'obvious' or otherwise brought to the agency's attention." *Id.* (citation omitted). The claim must be presented "in sufficient detail to allow the agency to rectify the alleged violation." *Id.*; *see also Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 202 (3d Cir.1999) ("[T]he claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court."); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir.2002) ("Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met...."). The exhaustion requirement thus helps prevent premature claims and "ensure[s] that the agency possessed of the most expertise in an area be given first shot at resolving a claimant's difficulties." *Id.*

---

5. The statute prescribes:
   Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against—

      (1) the Secretary;
      (2) the Department; or
      (3) an agency, office, officer, or employee of the Department.
   7 U.S.C. § 6912(e).

The district court concluded that § 6912(e)'s exhaustion requirement is jurisdictional. Administrative exhaustion is often an affirmative defense, rather than a jurisdictional prerequisite. *Jones v. Bock,* 549 U.S. 199, 212, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) ("[T]he usual practice under the Federal Rules is to regard exhaustion as an affirmative defense."). Judicially created exhaustion doctrines, in particular, are prudential in nature. *McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), *superseded by statute on other grounds,* Prison Litigation Reform Act of 1995, Pub.L. No. 104–134, 110 Stat. 1321 (1996). But a statutory exhaustion requirement may be jurisdictional if it provides "more than simply a codification of the judicially developed doctrine of exhaustion." *Weinberger v. Salfi,* 422 U.S. 749, 765–66, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). We must evaluate each statute separately, showing "regard for the particular administrative scheme at issue." *Id.; see also McCarthy,* 503 U.S. at 144, 112 S.Ct. 1081 ("Of paramount importance to any exhaustion inquiry is congressional intent." (internal quotation marks omitted)). Among other criteria, we look for "sweeping and direct statutory language that goes beyond a requirement that only exhausted actions be brought." *Steele v. Fed. Bureau of Prisons,* 355 F.3d 1204, 1208 (10th Cir. 2003) (internal quotation marks omitted), *overruled in part on other grounds by Bock,* 549 U.S. at 214–15, 127 S.Ct. 910; *see also Salfi,* 422 U.S. at 757, 95 S.Ct. 2457 (noting that the section's language was "sweeping and direct and [ ] states that no action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted").

The courts of appeals are split as to whether 7 U.S.C. § 6912(e) is jurisdictional. *See Dawson Farms, LLC v. Farm Serv. Agency,* 504 F.3d 592, 603–06 (5th Cir.2007) (discussing the views of the various circuits). We need not resolve the issue. Regardless of whether it is jurisdictional, the explicit exhaustion requirement in § 6912(e) is, nonetheless, mandatory. *Forest Guardians,* 495 F.3d at 1170; *McCarthy,* 503 U.S. at 144, 112 S.Ct. 1081 ("Where Congress specifically mandates, exhaustion is required."); *see also Bastek v. Fed. Crop Ins. Corp.,* 145 F.3d 90, 94–95 (2d Cir.1998) (noting that § 6912(e) "unambiguously required plaintiffs to exhaust their administrative remedies before bringing suit, and their failure to do so deprived them of the opportunity to obtain relief in the district court"). Forest Guardians concedes that it did not exhaust its BAS argument during the administrative process. It suggests that we should excuse the exhaustion requirement, but its arguments are unavailing.

Section 6912(e) does not contain any explicit exceptions to the exhaustion requirement. However, judicially created exhaustion doctrines are "subject to numerous exceptions," *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), and several circuits have extended these exceptions to § 6912(e). *See Dawson Farms,* 504 F.3d at 606 (discussing § 6912(e) and the "extraordinary circumstances" and "limited bases" warranting an excuse of administrative exhaustion); *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.,* 440 F.3d 992, 1000 (8th Cir.2006) (noting that exhaustion under § 6912(e) may be excused "if the complaint involves a legitimate constitutional claim, if exhaustion would cause irreparable harm, if further administrative procedures would be futile, or if the issues to be decided are primarily legal rather than factual" (citation omitted)); *McBride Cotton & Cattle Corp. v. Veneman,* 290 F.3d 973, 980–82 (9th Cir. 2002) (excusing a failure to exhaust under § 6912(e) where the suit alleged a consti-

tutional claim that was colorable, collateral to the substantive claim, and its resolution would not serve the purposes of exhaustion because exhaustion would be futile); *see also* Marcia R. Gelpe, *Exhaustion of Administrative Remedies: Lessons from Environmental Cases*, 53 Geo. Wash. L.Rev. 1, 26, 64–65 (1984) (discussing judicially created exceptions to exhaustion in the environmental litigation context, observing that "exceptions to the exhaustion requirement are not clearly delineated," and arguing that courts "should be more insistent on requiring exhaustion of administrative remedies in environmental cases" and, more specifically, that "if there is significant doubt whether the facts fall into an exception [to the exhaustion doctrine], courts should require exhaustion").[6] We have never decided which, if any, of these exceptions are applicable, nor need we do so now. Even assuming that we could bypass § 6912(e)'s express direction, no exception is warranted on the facts of this case.

■ Forest Guardians argues that it would have been futile to present its BAS challenge to the agency, because the USFS already had adopted the position that the A/C Project complied with the 2000 BAS standard when Forest Guardians filed its administrative challenge, i.e., the USFS had predetermined the issue before it. *See Frontier Airlines, Inc. v. Civil Aeronautics Bd.*, 621 F.2d 369, 370–71 (10th Cir.1980) (excusing a statutory exhaustion requirement because that statute's "reasonable grounds" exception was met and the question was one of pure statutory interpretation). But despite the USFS's perceived stance on that issue, exhaustion of the BAS argument would not have been "futile" in the sense in which courts have applied this exhaustion exception. Specifically, there is no argument that: the USFS lacked the authority or the ability to resolve the challenge to the project approval, *see McBride Cotton & Cattle Corp.*, 290 F.3d at 982; *Ace Prop. & Cas. Ins. Co.*, 440 F.3d at 1000–01; this is purely a question of statutory interpretation, *see Frontier Airlines*, 621 F.2d at 371; or the court would not benefit from allowing the USFS to develop a full administrative record on the issue for our review, *see Ace Prop. & Cas. Ins. Co.*, 440 F.3d at 1000–02; *see also Salfi*, 422 U.S. at 765, 95 S.Ct. 2457 ("Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review."). Thus, assuming *arguendo* we could excuse § 6912(e)'s exhaustion requirement, Forest Guardians has not proffered reasons that demonstrate that an exception is warranted.

■ Forest Guardians further argues that administrative exhaustion of the BAS argument should not be required because it would be unfair to require exhaustion of a claim that it did not know that it had at the time it filed its administrative appeal. Forest Guardians reasons that when it filed its appeal with the USFS in July 2004, Tenth Circuit case law indicated that the 1982 Rules would be applicable to the A/C Project. Forest Guardians points to *Utah Environmental Congress v. Bosworth (UEC I )*, 372 F.3d 1219 (10th Cir. 2004), which was issued on June 23, 2004. Related decisions in this circuit dealing

---

**6.** *But see Bastek,* 145 F.3d at 94–95 (refusing to consider exceptions to § 6912(e)'s requirement because "courts are not free to dispense with" such a mandatory statutory exhaustion requirement).

with the application of the 1982 Rules and the 2000 BAS standard were not released until after the administrative appeal was decided in August 2004. It is true that in *UEC I*, we applied the 1982 Rules under the stated rationale that they were the regulations in effect in December 2000, the time of the USFS decision at issue. *UEC I*, 372 F.3d at 1222 n. 1. We also noted, however, that the regulations had changed in 2000. *Id.* In addition, Judge Baldock's concurrence observed that "the Forest Service's adoption of new planning regulations effectively moots the issue [of interpreting the 1982 Rules] in future cases." *Id.* at 1232 n. 1 (Baldock, J., concurring). Accordingly, even though the 1982 Rules were applied in *UEC I*, that same case provided Forest Guardians—pre-administrative appeal—with notice that the 1982 Rules would not necessarily apply to the A/C Project.

It is not inequitable to require Forest Guardians to have made an argument about the 2000 BAS standard in July 2004, even if there was some confusion as to the proper standard. Forest Guardians' reliance on *Bowen v. City of New York*, 476 U.S. 467, 482–87, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), for the proposition that exhaustion would be unfair, is misplaced. In *Bowen*, the Supreme Court waived the administrative exhaustion requirement because plaintiffs had been subjected to an "unrevealed policy that was inconsistent in critically important ways with established regulations." *Id.* at 485, 106 S.Ct. 2022. Here, by contrast, the published federal regulation in effect on the date Forest Guardians filed its administrative appeal indicated that during the transition period beginning November 9, 2000, "the responsible official must consider the best available science in implementing and, if appropriate, amending the current plan." 36 C.F.R. § 219.35(a) (2004); *see also Forest Watch*, 410 F.3d at 118 ("[T]he plain language of the 2000 Transi-

tional Rule dictates that the 'best available science' standard applies when the agency is 'implementing' a forest plan during the relevant time period."). Thus, rather than being victimized by an unpublished policy, Forest Guardians was provided notice by, the plain language of the regulation that the applicability of the 2000 BAS standard was, at the very least, a pertinent issue. In addition, the ensuing uncertainty regarding the application of the 1982 Rules and the 2000 BAS standard was commented upon publicly by courts as well as the USFS prior to the filing of Forest Guardians' administrative appeal. *See, e.g., Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 967–69 (9th Cir.2003) (noting concerns that arose regarding the 2000 transition provisions); National Forest System Land and Resource Management Planning; Extension of Compliance Deadline, 66 Fed.Reg. 27,-552 (May 17, 2001). If anything, we would expect such public commentary to convey to a litigant the potential applicability of the BAS standard to a project in July 2004 and, consequently, the reasonableness of advancing an argument relating to that standard, even if only as an alternative to a 1982 Rules argument.

Therefore, because Forest Guardians did. not argue during the administrative process that USFS failed to consider and apply the 2000 BAS standard when it implemented the A/C Project, we conclude that Forest Guardians failed to adequately present the BAS argument in its administrative appeal and thus has forfeited it. *See Forest Guardians*, 495 F.3d at 1171; *cf. Utah Envtl. Cong. v. Troyer (UEC IV)*, 479 F.3d 1269, 1288, 1292 (10th Cir.2007) (McConnell, J., dissenting in part) ("At no point has plaintiff UEC argued that the projects violated the 'best available science' standard.... If UEC had argued that the decisions in question were deficient under the 'best available science'

standard, the Forest Service would have been able to respond, and the district court would have been able to make appropriate findings."). Therefore, we do not reach the merits of Forest Guardians' BAS claim.[7]

### 2. *The Inapplicability of Chenery*

The Supreme Court's decision in *SEC v. Chenery Corp.* stands for the proposition that a reviewing court may not affirm an agency decision based on reasoning that the agency itself never considered. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The Partial Dissent characterizes our decision as holding: "Forest Guardians is barred from challenging the Agua–Caballos project on the ground that the agency changed its rationale when the project was challenged in court." *See* Partial Dissent at 1131. The Partial Dissent thus suggests that our holding bars Forest Guardians from raising a *Chenery* challenge.

We respectfully disagree. *Chenery* is largely inapposite, and the Partial Dissent's misguided reliance on its analytic rubric results in an incorrect interpretation of our holding. Forest Guardians' appeal does not center on the district court's failure to apply *Chenery*. Instead, it has presented a merits challenge based upon the purported failure of the USFS to consider and apply the 2000 BAS standard; it has contended that this failure effected a NFMA violation. It raises *Chenery* in an effort to bolster its merits argument—specifically, to prevent the USFS from defending the project on the basis of the 2000 BAS standard. Aplt. Opening Br. at 44–45 (noting that it was "undisputed" that "the USFS consistently applied the 1982 NFMA regulations throughout the planning and decision-making processes for the A–C project" and, consequently, "there can be no doubt that the USFS's A–C project decision must be vacated pursuant to the *Chenery* rule").

**7.** Forest Guardians suggests that our decision in *Ecology Center, Inc. v. U.S. Forest Service*, 451 F.3d 1183 (10th Cir.2006), requires us to reverse the approval of the A/C Project. In *Ecology Center*, the USFS had approved a project based on the 1982 Rules. *Id.* at 1192. However, we concluded that the 2000 transition provisions, and in particular the BAS standard, applied. *Id.* at 1191–92. We noted that " 'a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.' " *Id.* at 1195 (alteration omitted) (quoting *SEC v. Chenery Corp. (Chenery II )*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). Because the USFS applied the wrong standard, we remanded the case to the district court with instructions to vacate the approval of the project. Moreover, we did so without regard to the specific challenges raised by the plaintiffs. *Id.* ("[W]e need not decide if Ecology Center's myriad of pointed arguments regarding Forest Services's failure to comply with the Forest Plan's habitat and monitoring re-

quirements demonstrates that the Forest Service engaged in a clear error of judgment when it approved the Griffin Springs Project."). We reached a similar decision in *UEC IV*, 479 F.3d at 1287–88, and in *Utah Environmental Congress v. Richmond (UEC V )*, 483 F.3d 1127, 1135–36 (10th Cir.2007) (noting that "we are faced with the same scenario we encountered in *Ecology Center* ").

However, no party put exhaustion at issue in those cases. Therefore, in a case like this one, where the USFS raised the exhaustion question, they are inapposite. Furthermore, they are not germane to our analysis for another reason: in those cases, we reached the merits of the underlying challenge to the projects' approval. But not here. In fact, we express no opinion as to the standards employed by the USFS. Our analysis is limited only to the question of whether Forest Guardians preserved the issue for judicial review (i.e., the exhaustion question). And, as to that question, our precedent does not suggest, much less mandate, a different path than the one we travel here.

The district court simply determined that Forest Guardians' overarching BAS merits argument—not its subsidiary *Chenery* contention—is barred because Forest Guardians failed to exhaust it. And we agree, detailing in this decision the administrative developments related to the implementation of the 2000 BAS standard and noting that those developments should have put Forest Guardians on notice that the 2000 BAS standard might be applicable and that, consequently, it should challenge before the agency the USFS's purported failure to consider and apply that standard.

*Chenery* probably would have been directly at issue if (1) the district court—instead of resolving the matter on exhaustion grounds—had reached the merits of the USFS's argument that the USFS in fact properly applied the 2000 BAS standard and endorsed this view; and (2) we then subsequently affirmed on that basis. But that is not the situation here. The district court did not reach the merits. *See* Aplt. Opening Br. Attach. at 39 ("The Plaintiffs failed to exhaust the administrative process, and because exhaustion of the administrative process is mandatory, the Court will not address the merits of the Plaintiffs' claims that the USFS did not apply the 'best available science' standard"); *see also* Aplt. Opening Br. at 32–33 (recognizing that the district court did not reach the merits). As noted above, we also have expressly declined to reach the merits and do not affirm on that basis. In other words, we do not uphold the USFS's decision on reasoning that was never presented to and considered by the agency—which would run afoul of *Chenery*.

Like the district court's, ours is an exhaustion ruling. And it bears underscoring that this ruling relates to Forest Guardians' merits argument concerning the 2000 BAS standard; beyond that, we do not stray. Therefore, we need not

quarrel with the Partial Dissent's assertion that "a *Chenery* claim is never barred for failure · to exhaust administrative remedies," Partial Dissent at 1132, because our exhaustion ruling does not relate to any purported *Chenery* claim by Forest Guardians.

■ The exhaustion and *Chenery* doctrines involve distinct but related inquiries. "The ˙ exhaustion doctrine furthers this [*Chenery*] principle by ensuring that an agency always has an opportunity to justify its action." *Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 925 n. 9 (D.C.Cir. 1982); *cf. Skubel v. Sullivan*, 925 F.Supp. 930, 944 (D.Conn.1996) (reflecting a relationship between *Chenery* and exhaustion by noting that the agency defendants' "substantive arguments . . . in their briefs technically fall into the category of impermissible post-hoc rationalizations" under the *Chenery* principle, but presuming that the agency defendants would have raised the arguments in a denial of a petition for rulemaking "given that this Court has excused the plaintiffs' failure to exhaust their remedies by petitioning for rulemaking"), *aff'd as modified on other grounds sub nom. Skubel v. Fuoroli*, 113 F.3d 330, 335 (2d Cir.1997) ("[W]e find that the district court properly exercised its discretion in excusing plaintiffs' failure to exhaust their administrative remedies."). The exhaustion doctrine, however, is independently operational and may in fact eliminate the need for further inquiry into a possible *Chenery* problem. For instance, it seems quite clear as a matter of logic that if the agency rationale that is alleged to be late-blooming as contemplated by *Chenery* relates to a claim that a plaintiff has not exhausted and the agency asserts exhaustion as a defense, then this would be at least one situation where application of the exhaustion doctrine might well negate the

need to reach the possible *Chenery* problem. That is the situation before us here.[8]

In large part, our disagreement with the Partial Dissent relates to the framing of the question in light of the two distinct inquiries (i.e., concerning exhaustion and *Chenery* ). As the Partial Dissent would have it, the question is the following: whether the district court may affirm the USFS on a substantive rationale that the USFS did not raise before the agency. The Partial Dissent suggests that our holding prevents Forest Guardians from raising the *Chenery* problem to bar this district court action. We respectfully submit that the Partial Dissent is asking the wrong question and that doing so leads it to incorrectly interpret the effect of our holding. Generally, the question is whether—possessing adequate notice of a claim for relief, i.e., the possible applicability of the 2000 BAS standard and USFS's purported failure to consider and apply it—Forest Guardians is precluded from pursuing that claim in federal court, when Forest Guardians failed to raise the claim before the administrative agency. Under this framing of the question, there is no *Chenery* problem. The district court simply answered the question in the affirmative through a straightforward application of exhaustion principles, and we affirm on the same basis. These exhaustion rulings do not relate to any purported *Chenery* claim of Forest Guardians, and neither the district court nor we reach the merits of

the BAS argument. For the foregoing reasons, we believe that our exhaustion holding is sound and respectfully disagree with the approach of the Partial Dissent.

### C. 16 U.S.C. § 1604(g)(3)(B)

■ Forest Guardians next asserts that the A/C Project runs counter to the Carson Forest Plan and the NFMA's substantive obligation to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B); *UEC II*, 439 F.3d at 1188. Forest Guardians argues that the USFS's explanation for its approval of the A/C Project runs counter to the evidence that was before the agency. *See UEC III*, 443 F.3d at 739. Specifically, Forest Guardians contends that the approval was arbitrary and capricious because the project's detrimental effects on the Abert's squirrel is incompatible with the NFMA requirement to protect species diversity. Although the USFS argues that this project-specific argument should fail because the NFMA's statutory diversity requirements apply to forest plans rather than particular projects, we have recognized that individual projects, as well as the overarching forest plan, must comply with the NFMA. *UEC II*, 439 F.3d at 1188 (citing 16 U.S.C. § 1604(i)).

Forest Guardians' basic argument is that the A/C Project violates the NFMA

---

8. On the other hand, viewed from another, hypothetical angle, if Forest Guardians had challenged before the agency the USFS's purported failure to consider and apply the 2000 BAS standard—as our holding indicates that it was obliged to do—then the USFS would have had an opportunity to respond to the challenge. And, then, if the USFS failed to do so and subsequently sought to argue its compliance with the 2000 BAS standard before the federal courts, there would be a *Chenery* problem. *Cf. Diallo v. U.S. Dep't of Justice*, 548 F.3d 232, 235 (2d Cir.2008) ("[I]f we find

an error in the BIA's decision on an issue that *was exhausted before it*, because we cannot substitute our judgment for that of the agency, *Chenery I* would seem to require us always to remand." (emphasis added)). Thus, enforcing the exhaustion doctrine actually would encourage litigants, like Forest Guardians, to litigate before agencies in a manner that will keep *Chenery* problems from arising in the first instance. And, relatedly, doing so would create a zone of bona fide *Chenery* concern—a zone into which this case does *not* fit.

substantive requirement to provide for diversity because, even though population levels for the Abert's squirrel are below the USFS's minimum viable population threshold and are declining, the A/C Project calls for the destruction of additional squirrel habitat, which will lead to further decline in population.[9] The case that Forest Guardians cites for the proposition that the NFMA mandates the maintenance of minimum viable populations of certain species as part of the USFS's § 1604(g)(3)(B) obligation actually relies on a version of the now-superseded 1982 Rules. *See Idaho Sporting Cong., Inc.*, 305 F.3d at 961 (quoting 36 C.F.R. § 219.19 (1999)[10]). The ROD for the A/C Project itself, however, does prescribe that "viable populations" of MIS be maintained. J.App. at 291. Even assuming that a failure to maintain a viable population of Abert's squirrel could equate to a violation of the statutory diversity requirement of § 1604(g)(3)(B), however, Forest Guardians ultimately fails to carry its heavy burden to establish that the USFS's conclusion regarding environmental impact and the effect of the A/C Project on the Abert's squirrel ran counter to the evidence before the agency.

The Carson Forest Plan itself specifically had been developed with favorable effects on the Abert's squirrel in mind: "By creating a diversity of stand conditions and providing juxtaposition of stands over time and space, suitable habitat components of Abert['s] . . . squirrels will be maintained over time."[11] J.App. at 137. Numerous planning documents and the ROD show the extensive analysis undertaken in connection with the A/C Project and reflect the USFS's rationale for its conclusion that the A/C Project is compliant with the Carson Forest Plan and the NFMA, including with regard to the Abert's squirrel. In its 2003 forest-wide MIS assessment, for example, the USFS collected and assessed data on the Abert's squirrel, including the effects of various management activities on its habitat types, its habitat trends, and quantitative population trend data and viability. The assessment noted that while "[i]ndiscriminate logging can degrade Abert's squirrel habitat," and "historic heavy harvesting" and fire suppression have resulted in a less diverse habitat in certain vegetation structural stages, the current habitat condition for the Abert's squirrel "is poor to fair, but in a slight upward trend." J.App. at 201.

9. Forest Guardians also had argued to the district court that the USFS's approval was inconsistent with the Carson Forest Plan because that plan required the Abert's squirrel be maintained at populations "greatly exceeding minimum viable populations." Aplt. Opening Br. Attach. at 39–40, 45. The district court rejected this argument, noting that while the "greatly exceeding" language had appeared in documents used in the planning process, it did not appear in the forest plan itself. On appeal, Forest Guardians does not pursue this assertion. Nor does Forest Guardians dispute that this language did not appear in the Carson Forest Plan or argue that it had been incorporated into the plan as a mandatory standard. *See Ecology Ctr. v. Castaneda*, 562 F.3d 986, 993–94 (9th Cir. 2009).

10. When in effect, 36 C.F.R. § 219.19 had read in part: "Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area."

11. *See generally* Patton, *supra* note 1, at 409 (noting that "unlike other tree squirrels, [the Abert's squirrel] does not store food for winter use" and is dependent on trees for its existence and that "[e]vidence and field experience indicate that tree density, size, and dispersion pattern contribute to squirrel habitat"); *see also supra* note 2 (offering definitions of "stand").

This thorough assessment concluded that in contrast to historical practices, "[m]ore recent management has tended to focus on thinning from below" and "group selections across the Forest"—practices that "enhance[ ] Abert's squirrel habitat" and "that in turn should assure its survival." *Id.* at 202. Examining various sources of data, the MIS assessment concluded that the Abert's squirrel population in the Carson National Forest is "stable, but likely lower than potential" and they are "in no danger of extinction." *Id.* at 204. Overall, the USFS concluded, "the Carson National Forest is sustaining viable populations of Abert's squirrel. Continued implementation of prescribed burning and thinning should continue to improve the squirrel's habitat." *Id.*

The 2003 Supplement to the Final Environmental Impact Statement for the project considered the findings of that 2003 MIS assessment—including an extensive, Abert's-squirrel-specific examination of environmental factors, habitat conditions and trends, population trend and viability, and effect of proposed activities—and determined that, over the long term, implementation of any of the proposed alternatives for the A/C Project "would either maintain or improve habitat conditions and populations for [MIS]." *Id.* at 215. Also used in the planning process was the 2004 Final Supplement to the Final Environmental Impact Statement for the A/C Project. This report explained that twelve years of environmental analysis had gone into the A/C Project, extensively described habitat and population developments for the Abert's squirrel, and reported that the project "would maintain an upward trend for Abert's squirrel quality habitat across the Carson National Forest." *Id.* at 247, 248–50. Thus, the ROD concluded that the A/C Project would "contribute to improving or maintaining [MIS] habitat and sustaining their populations on the Carson National Forest." *Id.* at 292. The ROD

prescribed that prior to implementation of activities within squirrel habitats, stands within those habitats would be reevaluated for Abert's squirrel activity and treatments would be deferred within high-activity areas. *Id.* at 291.

■ We grant considerable discretion and deference to federal agencies on matters that require a high level of technical or scientific expertise. *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *UEC III,* 443 F.3d at 739. Although Forest Guardians alleges that the evidence shows that there has been a decline in the Abert's squirrel population, that the population is below optimal levels, and that the decline was caused at least partly by USFS timber sales, we do not find that it has demonstrated that the agency's A/C Project decision runs counter to the evidence. Specifically, none of the evidence pointed to by Forest Guardians sufficiently supports its proposition that if "the USFS has authorized destruction of some of the Abert's squirrel remaining habitat" then it follows that "the A–C project decision violates the USFS's statutory duty" under the NFMA. Aplt. Opening Br. at 55. Forest Guardians points to isolated statements—contained in a 2003 report from a monitoring program initiated by the USFS—that note some declines in the Abert's squirrel population densities within the Carson National Forest and conclude that logging and "intensive, widespread thinning" can have an adverse effect on the habitat and population of that species. J.App. at 229–30, 238. The report also opines that compared to previous estimates, the squirrel densities observed were extremely low after a major decline in 2002.

■ This same report, however, concluded that its density estimates might be artificially low due to the timing of the monitoring and that climate related factors

may account for some of the decline. "Though a party may cite studies that support a conclusion different from the one the Forest Service reached, it is not our role to weigh competing scientific analyses." *Castaneda,* 562 F.3d at 992. Running throughout Forest Guardians' argument appears to be the general assumption that any timber harvesting equates to negative effects on the Abert's squirrel habitat and population. Without more, Forest Guardians' sparse evidence and its unproven proposition cannot defeat the USFS's contrary conclusion. *See* J.App. at 202 ("Management practices of thinning from below and group selections across the Forest enhance[ ] Abert's squirrel habitat[, which] in turn should assure its survival." (citation omitted)); *cf. Lands Council v. McNair,* 537 F.3d 981, 997 (9th Cir.2008) ("A habitat disturbance does not necessarily mean that a species' viability will be threatened.").

We find that the USFS's approval was not arbitrary and capricious and its explanation did not run counter to the evidence before it. It was rational for the agency to conclude that the A/C Project was consistent with the mandates of the NFMA and the Carson Forest Plan, including in its effect on the Abert's squirrel. The USFS did not violate the NFMA's statutory requirement to provide for species diversity by approving the A/C Project.

### D. *16 U.S.C. § 1604(i)*

■ Finally, Forest Guardians contends that the A/C Project is not consis-

tent with the Carson Forest Plan's monitoring requirements and therefore violates the NFMA "consistency provision." [12] 16 U.S.C. § 1604(i); *Ohio Forestry Ass'n,* 523 U.S. at 730, 118 S.Ct. 1665 (noting that before the USFS can begin a project it must "ensure that the project is consistent with the [applicable] Plan"). More specifically, Forest Guardians asserts that the A/C Project violates the requirement imposed to monitor population trends of MIS species in the site-specific project area. The monitoring program of the Carson Forest Plan states: "The purpose of monitoring and evaluating the implementation of the Forest Plan is to inform the decision maker of the progress toward achieving the goals, objectives, and standards and guidelines." J.App. at 138. Monitoring also will determine whether "standards are being followed" and "if the effects of implementing the Forest Plan are occur[r]ing as predicted." *Id.* As discussed above, the monitoring program requires that MIS be identified and that five years of baseline data of each MIS be collected, followed by periodic monitoring of MIS population and habitat trends. The A/C Project likewise adopted a monitoring plan, to be periodically assessed and updated, designed to apprise interested parties "of progress toward the goals and objectives" and "provide information on the impacts of [USFS] activities on [MIS] to ensure viable populations are maintained." *Id.* at 291.

■ Forest Guardians asserts that the USFS failed to comply with the monitoring

---

**12.** Although Forest Guardians previously had framed this argument as a violation of the monitoring requirements of the 1982 Rules, a deficient monitoring claim still may be viable, regardless of whether the 1982 Rules were incorporated into the applicable forest plan, if the monitoring provisions are part of the plan itself. *UEC V,* 483 F.3d at 1135–36 ("[T]he Forest Service is obligated to apply the new regulations and is also bound to apply the

terms of the 1986 forest plan, including the obligation to monitor the management indicator species listed in the plan, to the extent the plan does not conflict with the 'best available science' standard."); *see also* 36 C.F.R. § 219.14(f) (2005) (noting that the USFS must comply with plans developed prior to November 9, 2000, that "specifically require[ ] population monitoring or population surveys" for MIS).

requirements and methodologies of the Carson Forest Plan, including the requirement to acquire five years of baseline data, and thus the approval of the A/C Project is inconsistent with the plan. *Cf. UEC III*, 443 F.3d at 749 ("In essence, [the plaintiff] argues that the Forest Plan requires the collection of . . . data as a condition precedent to the approval of the . . . [p]roject."). Regardless of whether the A/C Project's monitoring is deficient, however, no cognizable claim regarding this alleged failure exists, because the project's approval was not conditioned upon meeting monitoring requirements. This court has clarified that while a forest plan's forest-wide monitoring program does not constitute final agency action, "we may review a monitoring program to the extent it bears on the approval of a particular project." *Id.* "[I]f a project's approval is conditioned upon the fulfillment of certain monitoring obligations, a plaintiff may bring a claim of deficient monitoring. Without such a relationship, a claim of deficient monitoring simply is not cognizable." *Id.* at 750; *see also UEC V*, 483 F.3d at 1134 (noting that the plaintiff must establish "the required nexus" between the monitoring and the project approval).

While the Carson Forest Plan monitoring program does outline that MIS should be monitored, there is nothing in the program that conditions approval of any individual project—such as the A/C Project— on fulfillment of these monitoring goals. Indeed, the monitoring program appears to contemplate monitoring being conducted on a forest-wide, rather than project-wide, level, and, further, being "at best tentative and exploratory." J.App. at 149. The Carson Forest Plan is distinguishable from those in cases where we have found a showing of "the required nexus" between the monitoring and the project. In *UEC V*, for example, the forest plan prescribed that if certain conditions were revealed during the monitoring process, then further evaluation or a change in management direction could occur. *UEC V*, 483 F.3d at 1133. In other words, that plan laid out a specific standard that made the monitoring requirements a condition precedent to management activities. *Id.* at 1134. In *UEC II*, we found that a project approval by the USFS did not satisfy the monitoring provisions of the applicable forest plan with regards to the Mexican spotted owl. *UEC II*, 439 F.3d at 1194. In that case, however, the forest plan contained species monitoring requirements designed to ensure that no decrease to any threatened, endangered, or sensitive animals resulted from "management activities." *Id.* That plan included a requirement that this "no decrease" standard be met, as demonstrated by the monitoring of the Mexican spotted owl. *Id.*

Forest Guardians has not pointed to any similar language demonstrating a connection between the Carson Forest Plan's monitoring program and the A/C Project, i.e., "no showing has been made that the applicable Forest Service regulations and directives conditioned approval" of the A/C Project "on the successful monitoring of [MIS] at either a forest-wide or project level" or on the meeting of a certain standard. *UEC III*, 443 F.3d at 750. Thus, we agree with the district court that Forest Guardians has no cognizable claim regarding USFS's alleged failure to comply with the monitoring requirements of the Carson Forest Plan.[13]

---

13. The district court also noted that the structure of the Carson Forest Plan indicates that the monitoring was not meant to be a condition precedent to project approval:

The Forest Plan was adopted in 1986, and at that time the USFS planned timber projects going forward beginning in 1987. *See* AR 000597–000599. If the USFS had intended the Monitoring Plan requirements to

## E. Requests to Supplement the Record

Judicial review generally focuses on the administrative record in existence at the time of the agency's decision. 5 U.S.C. § 706 (prescribing that a court's review pursuant to the APA is of "the whole record or those parts of it cited by a party"); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("[T]he focal point for judicial review [under the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court."). Forest Guardians wishes to supplement the record with a post-decisional scientific report in order to further support its BAS argument. Forest Guardians also requested permission to file a supplemental appendix containing portions of the administrative record as well as three additional non-record documents, also all in support of its BAS argument. We find nothing exceptionable in granting this request as to those documents that already were part of the administrative record. As for the non-record documents, we may consider extra-record evidence under very limited circumstances. *Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir.2007). Because we are not reaching the merits of the BAS argument, however, none of those circumstances is present here; there is no reason to examine documents submitted as support for that argument.

## III. CONCLUSION

The judgment of the district court is **AFFIRMED.** Forest Guardians' pending motions to supplement the administrative record and to file a supplemental appendix are **DENIED,** to the extent that the documents were *not* included within the administrative record, and otherwise **GRANTED.**

McCONNELL, Circuit Judge, dissenting with respect to Section IIB:

I agree with the majority's analysis in all other respects, but cannot agree with its conclusion, in Section IIB, that Forest Guardians is barred from challenging the Agua–Caballos project on the ground that the agency changed its rationale when the project was challenged in court.

Under the Supreme Court's seminal administrative law decision, *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943), courts may not affirm an administrative action on grounds different from those employed by the agency. In this case, the Forest Service approved the Agua–Caballos project under the 1982 rules, and supported the project throughout the administrative appeals process on the basis of those rules. It did the same when Forest Guardians challenged the decision in federal court and requested a preliminary injunction. In its brief opposing the preliminary injunction, however, the Forest Service for the first time suggested that the appropriate standard was in fact not the 1982 rules but the "best

be condition precedents to site-specific project approval, then the USFS would have planned on being non-compliant and in violation of NFMA's consistency requirements the year after the Forest Plan was adopted, because it would have been impossible at that point to have five years of baseline MIS monitoring. Such an intention would have been inconsistent with the way the Forest Plan was set up.

Aplt. Opening Br. Attach. at 41. Unfortunately, the referenced pages of the administrative record were not included in the parties' appendices, so we cannot verify this reasoning. Forest Guardians has not disputed this portion of the district court's opinion, however. *Cf. Ecology Ctr.*, 451 F.3d at 1192 n. 3 (relying on the excerpt of the document provided and assuming there were no relevant provisions within the portion not provided).

available science" standard, which had been adopted in November 2000 on a transitional basis.[1] Forest Guardians continued to argue that the 1982 rules governed, but also countered the Forest Service's best available science argument by contending that, under *Chenery*, the Forest Service was foreclosed from now defending its decision on a standard it had not applied during its actual decision-making. P. Rep. Br. of Feb. 6, 2006 at 11–12. By the time Forest Guardians filed its next brief in the case, this court had held in other cases that the 1982 rules were not the appropriate standard; instead, best available science should govern. Forest Guardians brought this to the attention of the court, saying that while it still believed the 1982 rules were the appropriate standard, *if* the court determined that best available science applied, it would have to vacate the decision and remand to the agency, as the Forest Service had not professed to apply that standard below. P.

Third Not. of Supp. Auth. at 4–5. The district court then convened a status conference during which it noted that best available science was the proper standard, that the Forest Service had not appeared to apply it, and that it was considering vacating and remanding. Instead of doing so, though, the court chose not to address the merits of the *Chenery* claim and vacate the decision but rather to find a failure to exhaust.

The majority holds that Forest Guardians may not object to the agency's change of rationale because it did not raise this particular argument before the agency during the administrative appeal process. In my opinion, however, a *Chenery* claim is never barred for failure to exhaust administrative remedies. It is not logically possible for a *Chenery* claim to arise during the administrative process, because at that stage the shift in rationale has not yet occurred. Only when the agency offers a new rationale in district court or the district court affirms on the basis of a new rationale does the *Chenery* problem arise.[2]

---

1. There was a great deal of uncertainty about what rules applied during the transitional period. As late as 2004, the Forest Service was still applying the 1982 rules. *Utah Environmental Congress v. Bosworth (UEC II )*, 439 F.3d 1184, 1189 (10th Cir.2006); *see also Forest Watch v. United States Forest Service*, 410 F.3d 115 (2d Cir.2005). For some time even our own court held that the 1982 rules governed management plans approved during the transitional period. *Utah Environmental Congress v. Bosworth (UEC I )*, 372 F.3d 1219, 1221 n. 1 (10th Cir.2004); *see also Utah Environmental Congress v. Bosworth (UEC II Superseded )*, 421 F.3d 1105, 1110–11 (10th Cir. 2005), *superseded by* 439 F.3d 1184 (10th Cir. 2006). The Forest Service applied the 1982 rules when approving the Agua–Caballos project and throughout the administrative appeals. In September 2004, however, the Department of Agriculture issued an interpretive rule stating that the "best available science" standard applied during the transitional period, not the 1982 rules. 69 Fed.Reg. 58,055–01 (Sept. 29, 2004). The Forest Service's decision to move immediately to the transitional rules may have been triggered by this court's decision in *UEC I* that compliance

with the detailed indicator species monitoring requirements of the 1982 rules must be achieved at the project level as a precondition to approval of any project. 372 F.3d at 1227. The prior interpretation seems to have been that these regulations required monitoring at the forest level, and provided that forestry management decisions be guided by the information this monitoring revealed about the health of the forest and the impact of various management practices. The shift in interpretation to the project level made many forest projects vulnerable to challenge under the 1982 regulations. If it intended to ease the path to judicial affirmance of forest projects by declaring, in 2004, that the "best available science" standard applied as of 2000, however, the Forest Service tripped over its own feet, because it made projects approved during the transitional period under the 1982 regulations vulnerable to challenge on the ground that they had not applied the new standards.

2. The Forest Service now contends that a review of the administrative record will show that the agency in fact did apply the best

The question of what arguments Forest Guardians asserted before the agency below is therefore irrelevant to our inquiry into whether the district court upheld the agency's action on an improper ground.

By faulting Forest Guardians for failing to raise the "best available science" standard during the administrative process, when the agency had not invoked that standard to support the proposed project, the majority misconceives the relation between exhaustion and *Chenery* claims. Exhaustion and *Chenery* are related in that each encourages arguments to be raised at the administrative level—exhaustion requires this of plaintiffs, and *Chenery* requires this of agencies. Here, it was the agency that failed to raise the "best available science" standard at the appropriate time, and yet we are removing the teeth from *Chenery* by using exhaustion to prevent the plaintiffs from calling them on it.

Because it is logically impossible for parties to raise a *Chenery* issue during the administrative process, the majority's holding effectively gives a green light to *Chenery* violations, so long as agency lawyers are quick-witted enough to plead lack of exhaustion. Upon discovery that the agency's rationale will not hold up in court, the lawyers offer a new one. When the plaintiff raises a *Chenery* objection, the agency lawyers cry, "no exhaustion." It should work every time.

Deciding whether to excuse exhaustion is an "intensely practical" inquiry that should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). Those policies include allowing an agency "an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." *Id.* (quoting *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)). Those concerns are not present here. There is no suggestion that Forest Guardians was withholding its *Chenery* claim so as to avoid agency review. The issue simply did not arise until the parties were before the district court. Nor do we need agency expertise when the issue is a straightforward legal one of whether an agency has changed the justification for its decision. Whether the forest project satisfies the "best available science" standard requires expertise; whether agency lawyers shifted their ground in district court does not.

The issue is not, as the majority seems to think, whether Forest Guardians could have anticipated that the 2000 transitional rules might be held to apply to the project. That may well be so. But the agency did not rely on the 2000 transitional rules when it approved the Agua–Caballos project. It relied on the 1982 regulations. Forest Guardians explained during the administrative process why it believed the agency action was unjustified under those 1982 regulations. It was not Forest Guardians' obligation to put forward or to counter alternative rationales that might support the agency action. And once in court, Forest Guardians could expect that, under *Chenery*, the Forest Service would be limited to defending the project on the basis of the administrative rationale.

Our holding is even stranger when considered in light of some of our other prece-

available evidence standard, though "not always explicitly labeling it as such." Aple. Br. 36 n. 9. The district court expressed skepticism of this argument during its status conference, as the Forest Service "does not point in record to where it used best available science standard." Clerk's Minutes of Jul. 19, 2006 Status Conf. at 2. This would be an issue for the district court to address while considering the merits of the *Chenery* claim; it is not a reason to bar the claim for a failure to exhaust.

dents involving projects approved during the transitional period. Between 2000 and 2004, the Forest Service approved a number of forest projects, using the criteria of the 1982 rules. After this court held that the "best available science" standard of the 2000 transitional rules was applicable to these projects, the Forest Service began to defend these agency decisions under the new standard. *See Ecology Center, Inc. v. U.S. Forest Service*, 451 F.3d 1183, 1195 (10th Cir.2006) (holding that when the Forest Service made transition-period decisions under the 1982 rules rather than the best available science standard, those decisions were arbitrary and capricious). In *Utah Environmental Congress v. Troyer*, a divided panel of this court found the Forest Service's approval of a project to be arbitrary and capricious under *Chenery* when the agency had made its decision under the 1982 rules, but the agency then successfully defended in federal district court under the best available science standard. 479 F.3d 1269, 1287–88 (10th Cir. 2007). The panel did so even though the environmentalist plaintiff had not even raised the *Chenery* claim in its appellate brief. *See id.* at 1289–90 (McConnell, J., dissenting) (arguing that the court should not reach the *Chenery* issue because plaintiff had raised it neither before the district court nor on appeal); *see also Utah Environmental Congress v. Richmond*, 483 F.3d 1127, 1136 (10th Cir.2007) (noting that in a conflict between the principle that we will not reverse a district court based on an argument not made by the plaintiff and the principle that we may not affirm an agency decision based on reasoning that the agency itself never considered, *Troyer* settled the issue in favor of the latter). The only difference between *Troyer* and the present case is that this time, after the

Forest Service changed its rationale, the plaintiff raised the *Chenery* issue. Apparently that was its mistake. If Forest Guardians had never raised the claim, the Forest Service would not have had occasion to argue exhaustion, and the court would have been under an obligation to raise the *Chenery* issue sua sponte, as we did in *Troyer* and *Richmond.*

With all respect, I think we have gotten it backwards. *Chenery* claims are not subject to the requirement of exhaustion, but they are forfeited if not raised on appeal.

I agree with the majority's resolution of Forest Guardians' other claims, but I cannot join its holding in Section II.B regarding the exhaustion requirement. I would remand to the district court for consideration of the *Chenery* claim on the merits.